Filed 1/5/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| T.J. SIMERS, | B269565 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC524471) |
| v. | |
| LOS ANGELES TIMES COMMUNICATIONS, LLC, | |
| Defendant and Appellant. | |

APPEAL from postjudgment orders of the Superior Court of Los Angeles County.  William A. MacLaughlin, Judge.  Affirmed.

Shegerian & Associates, Carney R. Shegerian and Jill P. McDonell for Plaintiff and Appellant.

Horvitz & Levy, David M. Axelrad, Scott P. Dixler; Davis Wright Tremaine, Emilio G. Gonzalez, Evelyn F. Wang; Ballard Rosenberg Golper & Savitt, Linda Miller Savitt and Elsa Bañuelos for Defendant and Appellant.

————————————————

**SUMMARY**

In March 2013, plaintiff T.J. Simers was a well-known and sometimes controversial sports columnist for Los Angeles Times Communications, LLC (The Times or defendant). He had held that position since 2000, receiving uniformly favorable and often exceptional performance reviews from defendant. On March 16, 2013, plaintiff, then 62 years old, suffered a neurological event with symptoms similar to a "mini-stroke." He recovered quickly, for the most part, and soon was again writing his thrice-weekly column.

Two and a half months later, The Times reduced plaintiff's columns to two per week, to "give [him] more time to write on [his] columns." His editors expressed the dissatisfaction of upper management with several recent columns, and stated "they had been having problems with [his] writing for the past 18 months." Two weeks later, The Times learned from an article in another publication that a Hollywood producer (who had just filmed a 90-second video that had "gone viral," in connection with one of plaintiff's columns) was apparently developing a television show loosely based on plaintiff's life. Viewing this as a possible ethical breach, defendant put plaintiff's columns "on holiday" for 10 days, and then, on June 24, 2013, suspended the column pending an investigation.

On August 8, 2013, after completion of the investigation and several meetings with plaintiff, defendant issued a "final written warning" that removed plaintiff from his position as a columnist and made him a senior reporter, albeit with no reduction in salary "for now." Plaintiff's lawyer informed defendant on August 12 that plaintiff could not work in that

2

environment and considered himself to have been constructively terminated.

On September 4, 2013, The Times asked plaintiff to return to his position as columnist. But defendant did not answer plaintiff's questions about how many columns he would write and whether he had to change his interviewing approach, and plaintiff did not trust The Times. The next day, plaintiff met with editors at the Orange County Register, and by September 9, 2013, had accepted a position as a columnist there.

On October 15, 2013, plaintiff sued The Times. After a 28-day trial in the fall of 2015, the jury found in favor of plaintiff on his claims of disability and age discrimination, and on his claim of constructive termination. The jury awarded plaintiff $2,137,391 in economic damages for harm caused by his constructive termination and $5 million in noneconomic damages. The parties agreed to give the jury a special verdict form that instructed them to fill in the blanks for past and future economic damages only if they found plaintiff was constructively terminated. The special verdict form allowed the jury to award past and future noneconomic damages without identifying which noneconomic damages were caused by the constructive termination and which were caused by the discrimination.

The trial court granted defendant's motion for judgment notwithstanding the verdict (JNOV) on plaintiff's constructive termination claim, and otherwise denied JNOV, finding substantial evidence supported the verdict on plaintiff's age and disability discrimination claims. The court also granted defendant's motion for a new trial on all damages, economic and noneconomic, finding it was not possible to determine what amount of noneconomic damages the jury awarded because of the

3

discrimination but not because of the constructive discharge. The court denied defendant's motion for a new trial on plaintiff's discrimination claims.

Both parties appealed. We affirm the trial court's orders.

**FACTS**

**1.    The Background**

**a.    Plaintiff's work at The Times**

Plaintiff joined The Times as a sports reporter in 1990. His editor at the time, Bill Dwyre, called him "the best, toughest reporter I had," "hard working" and "highly ethical," and in 2000 promoted plaintiff to columnist, a job plaintiff described as "the best job in the country." Mr. Dwyre picked plaintiff for the job because he "wanted somebody who I knew had guts and would go after tough subjects and would be a must read every day." The position of columnist was "the most prestigious writing position in the newspaper[.]" Plaintiff wrote three columns each week for the sports section until the spring of 2013, when the events that are the subject of this lawsuit occurred.

During his tenure as a sports columnist, plaintiff's performance reviews were uniformly positive. He often received overall ratings of "exceptional," and was described as a "brilliant columnist" and "unique among U.S. sports columnists."

Mike James became sports editor and plaintiff's supervisor in 2009. He too described plaintiff in glowing terms as dedicated and talented, with good interviewing skills, and he encouraged plaintiff's assertive and sometimes confrontational style. Plaintiff also worked with younger reporters, "[t]rying to guide them and instill some of the dogged reporting skills that can be important." Mr. James's review of plaintiff in February 2013, for the year 2012, described plaintiff's columns as "a must-read

4

element in The Times Sports section"; concluded plaintiff was "a very valuable asset to the department"; and gave him the highest possible rating in the "reporting and writing" category.

On February 1, 2013, the then-editor of The Times, Davan Maharaj, congratulated plaintiff on "[m]aybe the [b]est interview with [Kobe Bryant] yet. What a get. Thanks!"

### b. Plaintiff's freelance work

Under the ethics guidelines of The Times, staff members were "free to do outside creative, community or personal work, including writing articles and books, giving speeches or appearing on TV or online venues," but were required to "obtain clearance from a supervisor" before accepting freelance assignments. While Mr. Dwyre supervised plaintiff (through 2005), plaintiff had permission to do a radio show with his daughter five days a week, for two or three years. Plaintiff appeared on an ESPN television show (Around the Horn) for four or five months in 2003, after being recommended by Mr. Dwyre, and also appeared in a Disney movie. Plaintiff wrote about all those activities in his columns.

In 2002 or 2003, plaintiff began writing television scripts, writing and rewriting three or four of them. He told Mr. Dwyre about the script writing, and Mr. Dwyre correctly predicted his failure in those endeavors; "[n]one of them ever went anywhere[.]"

After Mr. James became sports editor in 2009, plaintiff told him about the scripts he had been writing and trying to promote, describing his meetings with production companies and "getting excited and then getting let down," and Mr. James "found it amusing." Mr. James, who had the authority to approve outside work, confirmed that if he knew about a project an employee was

5

working on and did not object to it, "that would effectively indicate that you have no objection to it, that you approve it – approve of it." Once an outside project has been approved, it "would not present a problem" if the project occurs "even three years down the line . . . ." Mr. James knew that plaintiff had an entertainment agent, and a script or proposal he was trying to sell for a television show about plaintiff and his daughter, and Mr. James saw no conflict of interest or ethical violation in plaintiff's doing so.

Over the years up to March 2013, plaintiff met with "somewhere around a dozen production companies," but got no further until he met Mike Tollin ("a big time producer") in August 2011 (after "a real script writing spurt" that ended in January 2011). (Plaintiff's agent, Bill Douglass, had told him to stop writing and instead to "talk ideas" and "come up with an idea that might excite [production companies].") Plaintiff pitched the father/daughter concept, and Mr. Tollin "was excited about the concept." Mr. Tollin told plaintiff, "Let's get this going" and "[l]et's see if we can make this work."

Plaintiff was excited by this development, and on August 18, 2011, sent an email to a friend saying he had a "deal with Mike Tollin" on a sitcom and "[w]ill let u know if it really goes anywhere." Two weeks later, he sent another email to a friend saying "by the way, I just sold a sitcom." (This apparently referred to the idea for a sitcom, and plaintiff never received any money for it.)

Plaintiff and Mr. Tollin tried to involve writer Alan Zweibel in the project, and Mr. Zweibel eventually wrote a treatment in October 2012. But by July 2012, when Mr. Zweibel cancelled a meeting, plaintiff believed the project was dead, and he never

6

saw the October 2012 treatment until discovery in this lawsuit. The last time plaintiff ever discussed the possibility of a father/daughter television show with Mr. Tollin was "probably October of 2012."

### c.    Plaintiff's health issues - March 2013

On March 16, 2013, plaintiff suffered stroke-like symptoms and was hospitalized in Phoenix.  Doctors told him he had had a "TIA" (transient ischemic attack) or "some sort of mini stroke," and the incident could be a precursor to a full-blown stroke. Plaintiff "was having trouble speaking," a problem "that every once in a while still pops up," and some difficulty walking.  He was "worn out," frustrated "because of the speech," and had "a headache in the back of my head, which I still have to this day."  In the weeks after the incident, his daughter observed plaintiff as very tired, very sluggish, limping a bit and intermittently "having trouble finding the right words."  Despite this, plaintiff completed a column while in the hospital and wrote another on March 18, 2013.

Plaintiff consulted Los Angeles neurologist Doojin Kim on March 25, April 4, and November 5, 2013.  Plaintiff had no symptoms at all on the first visit, and only headache on the second.  (On November 5, plaintiff "was complaining about concentration difficulties, memory difficulties, and executive functioning difficulties.")  Dr. Kim told plaintiff it was highly unlikely he had had a TIA, because his symptoms had lasted for more than 24 hours.  Dr. Kim ordered tests, and told plaintiff he may have suffered small strokes before the March 16 incident. He eventually diagnosed plaintiff with complex migraine syndrome, with symptoms that can mimic a stroke.  There is no

"absolute cure," but the symptoms can be eliminated with medication.

Plaintiff's neurologic event and its effects in the ensuing weeks were known to The Times, and were met with statements of concern and support. (Plaintiff wrote a column about his "mini stroke[]" and "TIA," mentioning problems with his typing and speech, on March 18. A column on March 26 again discussed his "mini-stroke or whatever it was . . . .") Mr. James reported plaintiff's hospitalization to Marc Duvoisin, the managing editor, and Mr. Duvoisin emailed plaintiff, saying he knew about TIA's and was very concerned; he encouraged plaintiff "to take as much time off as you need, and please let me know what, if anything, the paper can do to help," and "[y]our column will be waiting for you as soon as you feel up to it." Mr. Duvoisin in turn conveyed the information about plaintiff's "micro-stroke" to Mr. Maharaj, who promptly emailed plaintiff. Mr. Maharaj wrote that he had just read plaintiff's March 18 column "which was a hoot," and "we are SOOO fortunate to get through this with you intact."

After his hospitalization, plaintiff told Mr. James that he had to cancel an interview he had arranged with boxer Floyd Mayweather, because he (plaintiff) "was out of it. . . . I was exhausted. My brain was scrambled."

About two weeks after the incident, on April 2, 2013, Mr. James emailed plaintiff, expressing the hope that "everything went well in the tests" and suggesting a column topic, "[a]ssuming you're off the DL [(disabled list)] and still plan to write . . . ." The next day, Mr. James emailed plaintiff to say "This is just a great column. No one has written anything like this. Really good . . . ."

8

On April 4, 2013, Mr. Duvoisin wrote to plaintiff, saying plaintiff's column was "as vigorous and delightful as ever, but I hear you're still plagued by headaches. Please know that you have our full support to take as much time as you need to rest and recuperate. Everything . . . will be waiting for you on your return. We need another 20 years of columns out of you before you hang it up, so take whatever time you need to feel better." (Mr. Duvoisin knew from Mr. James that plaintiff was complaining of headaches.)

## 2. Events After Plaintiff's March 16 Hospitalization

In April and May, plaintiff "didn't know if [he] could get on a plane and have the energy to complete [an] assignment," and "articulated some of this to Mike James," telling Mr. James that he was "just trying to prove to myself that I can do this, but I believe I can." He was "just tired," and "[f]ocus and concentration were very difficult." He had "a constant headache in the back of [his] head that still to this day I have . . . ." "I'm always dealing with the headache in the back of my head, and I've let the people at the paper know that I had the headache. [¶] I wasn't asking for any special consideration. I just wanted them to know how I was, what I was doing."

Nonetheless, plaintiff continued to produce columns of the same quality as he had done before his hospitalization. Mr. James did not see any change in plaintiff's work product or in his dedication to his work quality after the March 16 incident (and as already noted, Messrs. James, Duvoisin and Maharaj all complimented him on his work). He "landed two very big interviews" that occurred in April and May 2013, one of them, set for May 30, 2013, with basketball player Dwight Howard (more about this below).

9

Then, at the end of May, Mr. Duvoisin and Mr. Maharaj began to express some displeasure with plaintiff.

**a.      May 28, 2013**

On May 28, 2013, Mr. James and assistant sports editor John Cherwa met with plaintiff and conveyed a decision by managing editor Duvoisin that plaintiff would write two columns per week rather than three, a decision that upset plaintiff.

The genesis of the column reduction, according to Mr. Duvoisin, was "a string of columns" plaintiff wrote in late April and May.

First, there was a series of columns written in Memphis in late April, in which plaintiff referred to Memphis as "Rathole," Tennessee.  Mr. Duvoisin "did not like that" and "thought that was inappropriate."  (But sports columnists had been using derogatory terms for other cities for many years, and plaintiff had done so numerous times without reprimand.  And plaintiff's column was required to be approved by one of the sports editors before publication, and the "Rathole" reference remained untouched.)

Second, Mr. Duvoisin was "troubled" by a column on May 11, 2013 about then Angels baseball team owner Arte Moreno, thinking the column was "needlessly harsh and unfair to" Mr. Moreno.  (Plaintiff wrote that the players were "very much like their owner, and as they say, the fish stinks from the head down.")

Third, Mr. Duvoisin was similarly troubled by plaintiff's column about Mark McGwire, then the Dodgers hitting coach, on May 15, 2013.  Plaintiff (according to his column) asked Mr. McGwire, who had a history of steroid use, "Is it time to introduce the players to steroids?" and "asked if he could still

10

score some steroids." Mr. Duvoisin thought the column was "needlessly caustic and harsh and wasn't funny" and "wasn't fair."

At the May 28 meeting, Mr. James conveyed several criticisms from Mr. Duvoisin and Mr. Maharaj, in addition to the issues with the three columns just described: they thought plaintiff's writing "had become sloppy" and they had been "having problems with [plaintiff's] writing for the past 18 months"; they "questioned his interviewing abilities" based on an interview he had done with Jim Mora in November 2012, at which plaintiff's behavior "reflected poorly on the paper" and was a "public embarrassment" to The Times; and "they had problems with stories filed right on deadline." (This last problem had never been documented at any time during plaintiff's 22 years with The Times. Mr. James testified that plaintiff met his deadlines, and John Cherwa, who had been deputy sports editor since 2009, testified that he "never had a problem with [plaintiff] filing his stories, his columns on time," and he was "very vigilant on filing on time.")

Mr. James told plaintiff he was "just delivering the message" about the column reduction; he told plaintiff it was not his decision. The removal of the third column "was not something that I would have suggested," and he "didn't know what it would achieve[.]" (Mr. Duvoisin claimed the column reduction was a suggestion by Mr. James and assistant sports editors Cherwa and Hiserman to resolve the problems Mr. Duvoisin had with the three columns; "their opinion was . . . that [plaintiff] had trouble hitting the same standard with the third column as he had with the other two.") Mr. James had never before documented plaintiff's writing as "sloppy," or told

11

plaintiff he was a "public embarrassment" to The Times, and he knew of no occasion on which plaintiff's columns had ever been suspended.

Mr. James could not recall ever criticizing plaintiff about the November 2012 Mora interview. Mr. James had been "a little concerned about it but not to the point that I thought it was a serious problem." (This interview with Mr. Mora (at a postgame press conference) had occurred six months earlier, and there was no criticism from upper management at the time.) The interview had been videotaped and posted on YouTube. In his column, and during the press conference, plaintiff expressed disbelief in various statements made by Mr. Mora (whom plaintiff had known for 25 years), and suggested Mr. Mora had intentionally held his UCLA team back, losing the game so the team would face Stanford instead of a better team in the upcoming championship game. Mr. James thought some of plaintiff's comments were "on the edge" in terms of a respectful interviewing technique, and plaintiff admitted in a column he wrote two days later that one of his comments was "[w]ay out of line." At the time of the May 28 meeting, Mr. James knew plaintiff had a longstanding, good relationship with Mr. Mora, who had just invited plaintiff to play in a charity golf tournament.

Mr. James told plaintiff "that he agreed with 85 percent of the work [plaintiff] was doing, but there was 15 percent that he agreed with upper management." And Mr. James "did not have a serious problem with [the three articles]," which were approved by his department before they were published.

Plaintiff, who took pride in his columns, was very upset about the column reduction, and received permission from Mr. James to meet with Mr. Duvoisin.

### b. May 29, 2013

Plaintiff and Mr. Duvoisin met the following day. Plaintiff told Mr. Duvoisin "how blindsided [he] was," and that he "didn't understand where it was coming from." Plaintiff explained "how passionate [he was] about newspapering[.]" They discussed the Mora interview, and Mr. Duvoisin conceded he might be "going overboard on . . . that criticism" and that perhaps it was not fair " 'to pick out one interview.' " Mr. Duvoisin "made it clear . . . he wasn't a fan of my writing for the past year," and "he just told me it wasn't up to L.A. Times standard." They discussed the three columns and Mr. Duvoisin's criticisms (for example, as to the McGwire column, " 'We just don't do that at The Times. We shouldn't be doing that at The Times' ").

Mr. Duvoisin also brought up the subject of plaintiff's health, urging him "to get physically right." Plaintiff said Mr. Duvoisin "was very nice about it," saying plaintiff should " 'take as much time off as you like [without] counting it as vacation,' " but "it's a weird thing when someone's being nice to you but you're not exactly sure they are being nice to you when they say, 'get physically right.' " Plaintiff questioned "[t]he notion that I wasn't physically right."

When the meeting concluded, Mr. Duvoisin said that they should continue the conversation when plaintiff returned from a planned trip. Plaintiff "felt invigorated" and that "maybe there was a chance that I had made some points about the interviewing process and . . . that he might reconsider [the column reduction]."

13

### c. May 30, 2013 - the Dwight Howard interview and videotaping

On May 22, 2013, plaintiff told Mr. James that he had obtained an exclusive interview with basketball star Dwight Howard, and that plaintiff's daughter "[would] be showing [Mr. Howard] how to shoot free throws . . . we're working on dates now." (Mr. Howard "wasn't great at free throw shooting," and Mr. James thought it was a "fun idea" to have plaintiff's daughter (who had been a successful high school basketball player) shooting free throws as a part of the interview process.) Mr. James said that obtaining the Howard interview was "huge," and was "access that is beyond the norm."

After the interview was arranged, plaintiff saw Mr. Tollin (the Hollywood producer) on television at a Dodgers game, and sent him a text message telling him his plans for the Howard interview. Mr. Tollin contacted plaintiff the next day. Mr. Tollin told plaintiff he had a new website that produced 90-second vignettes on sports figures, and suggested videotaping plaintiff's daughter teaching Mr. Howard how to shoot free throws. (On the day of the interview, this was changed to a free-throw competition.) At the time (May 2013), plaintiff "had no business relationship with Mike Tollin," and "no development T.V. show at that time."

Plaintiff told Mr. James that Mr. Tollin was a "high-powered producer" who had done work for ESPN, had done documentaries, had his own production company, Mandalay Media Sports, and wanted to promote the Mandalay Media website. Mr. James approved the videotaping by Mr. Tollin and his production company. (The videotaping idea and Mr. James's approval occurred on May 29, 2013, the day before the interview.

14

The Times's own videography department was "spread thin" and Mr. James planned to send a photographer.) The plan was that the video could run both on the Mandalay website and on The Times's site. Mr. James talked to Mr. Maharaj before the videotaping and "told him exactly what was going to happen," and Mr. Maharaj approved it.

During the videotaping, a Times photographer and (unexpectedly) a Times videographer arrived at the interview site, but arrived late, after the proceedings were underway. They thought the proceedings were being scripted or staged, and expressed their concerns to the deputy managing editor in charge of visual journalism, Colin Crawford. Mr. Crawford thought Mr. James should not have approved the videotaping by Mr. Tollin. Ultimately, Mr. Maharaj, Mr. Crawford and others decided not to run the video on The Times's website, but instead to run a link from plaintiff's column to the Mandalay Media website.

About an hour after the link was posted on The Times's website, Mr. Maharaj ordered Mr. Crawford to remove the link. Mr. Maharaj was "troubled by it" and said it was "basically like a promotional piece and he wasn't at all comfortable with it." Mr. Maharaj expressed concerns to Mr. James about plaintiff's daughter being in the video (Mr. Maharaj had told plaintiff in September 2012 that family photos should not accompany columns in The Times), and about plaintiff wearing a cap (that he always wore) showing the name of plaintiff's favorite charity for children.

Mr. James's opinion was that "it was an entertaining video and that it was okay to have up on the site." Plaintiff expressed his concern to Mr. James that The Times was not "following

15

through on an agreement we had [with Mandalay Media], and it made us look bad," and Mr. James admitted that "we did not follow through on the agreement."

### d.    The June 2, 2013 column

Plaintiff's column about Dwight Howard was published on June 2, 2013.  The day before, plaintiff sent Mr. Tollin a copy of the column, asking him if there were "any problems" with it. According to Mr. James, that was "not something we do," because "you're giving a source the opportunity to effect change in something that you're writing that may benefit that source."  The column made no mention of the video.

Mr. James was "very positive about the content [plaintiff] obtained," and "thought it was a column that would be highly read."  The column was longer than guidelines normally permitted, but was published "as it is" because "of the content that [plaintiff] had gotten . . . ."

### e.    The June 10, 2013 Sports Business Journal article

On June 10, 2013, the Sports Business Journal (SBJ) published an article about Mandalay Media.  The article stated, in relevant part:

> "Mandalay Sports Media is developing a TV comedy based on the life of acerbic Los Angeles Times sports columnist T.J. Simers, one of several projects the 15-month-old sports production company has in the pipeline.
>
> "Formed last March by Warriors co-owner Peter Guber and Hollywood producer/director Mike Tollin, Mandalay plans to pitch the Simers show to broadcast networks in the coming months.

16

" 'The series is about an old-school reporter in a medium that is quickly evaporating and a daughter who is a participant in the new media,' Tollin said. 'Ultimately, it will be a comedy focused on their relationship and the relationship they never had because he was always on the road and was kind of an absentee dad. He's kind of trying to make up for lost time. She's trying to teach the old dog new tricks.'

"Mandalay has not made casting decisions for the show yet – neither Simers nor his daughter will star in it.

"But Simers and his daughter played a starring role in a viral video Mandalay produced last month with Lakers All-Star center Dwight Howard. The video, of Simers' daughter beating Howard in a free throw shooting contest, was picked up by some of the most popular sports and entertainment websites, garnering more than 250,000 views.

". . . Carrying no advertising or sponsorships, the three-minute video did not make money for Mandalay Sports Media. But Tollin believes it helped create buzz, not only around the show but also around Mandalay's YouTube channel, which it launched last month.

" 'You'll never know if the viral video will help the series get off the ground. But we know that it won't hurt,' Tollin said."

f.      **Developments after the SBJ article**

The next day (June 11, 2013), plaintiff learned about the SBJ article in a text from "[s]omeone telling me that I had a T.V. show with Mandalay Sports Media." Plaintiff "texted Mike Tollin, and I said, 'I hear I have a T.V. show,' and I think I used

17

seven question marks."  Mr. Tollin called plaintiff later in the day, saying "no, it was just a story that I was hyping and . . . that was the angle [the reporter] took."  Mr. Tollin forwarded plaintiff the SBJ article that day, but plaintiff did not read it.

On the same day, June 11, plaintiff replied to Mr. Tollin's email forwarding the SBJ article, saying it had given him an idea.  Plaintiff then suggested and described "a weekly bit on your new web site" involving "athletes who made an impression on folks . . . but left tough questions unanswered," concluding with "of course this would mean me quitting my job, but that's talk for another day . . . ."

On June 13, 2013, The Times's editors saw the SBJ article. John Cherwa showed it to Mr. James, who brought it to Mr. Duvoisin and Mr. Maharaj.  Mr. James was "very concerned," because "if this is true, then I felt I had been denied information I needed to know before making the decision on having the video shot."  Mr. James thought it "was potentially a serious issue," because "it's a real conflict of interest to use any material that is in the paper or on our website as a vehicle to promote an outside operation that would benefit the . . . creator of the article." Mr. James "thought my superiors needed to see it from me before they saw it from someplace else."

Mr. Duvoisin was likewise concerned "because the article stated that the video . . . was intended to promote a T.V. show that [plaintiff] was developing on the side with . . . Mike Tollin," and "that was not what [Mr. James] understood when he approved the video to be shot . . . ."  Mr. Duvoisin and Mr. Maharaj decided that "we would need to look into this and find out what was going on."

18

### g. The June 14, 2013 column suspension

The next day, Mr. Duvoisin emailed plaintiff, telling him to "put your column on holiday for 10 days." Plaintiff and Mr. Duvoisin then spoke by telephone, and Mr. Duvoisin "essentially repeated himself, take the next 10 days off, very casually." He did not explain why the column was being suspended. Mr. Duvoisin told plaintiff he "did not want to get into it with [plaintiff] that night," a Friday, because both of them were leaving on trips the following morning, and they would talk when they were both back in the office, on Monday June 24. (Plaintiff went to Wisconsin to visit friends, returning shortly before the June 24 meeting.)

### h. The June 24, 2013 meeting

On June 24, plaintiff met with Mr. Duvoisin and Mr. Maharaj. Mr. Maharaj told plaintiff that " 'we're here to find out about your business relationship with Mandalay Sports Media, with your T.V. show, and with your efforts to promote your T.V. show on our internet site.' " Plaintiff told them he had no T.V. show and no business relationship with Mandalay Sports Media. He was "dumfounded." He had not read the SBJ article; he "didn't need to read it" once Mr. Tollin told him that there was no T.V. show. Plaintiff told Messrs. Duvoisin and Maharaj "that I had tried to do a T.V. show. I had tried to write lots of scripts, sell T.V. shows over the years, get a show off the ground. I worked with Mr. Tollin, . . . but I said that deal fell apart and died, had gotten nowhere, and all my efforts were now scrap paper." They showed him the SBJ article and he started to read it, but then laughed and said, "this is farcical," meaning "there just was no truth to it as far as what I knew."

19

Mr. Maharaj told plaintiff he "would be internally investigated into my business relationship with Mandalay Sports Media, my T.V. show," and plaintiff was outraged, telling the editors "there is no T.V. show." Mr. Maharaj told him, " 'We do not want to hear your side at this time.' " They "indicated to me that there was going to be an internal investigation conducted by the business editor, who I didn't know, and the photo editor, who I had never met."

Plaintiff continued to explain about his script writing, his agent, and that "everyone in the sports department knows I've done this for a number [of] years." Mr. Duvoisin "interrupted to say that I had violated the ethics guideline, because " 'you didn't have permission to pitch these ideas for outside work.' " Plaintiff again explained that Mr. James and before him Mr. Dwyre were "always aware of what I'd been doing." He told them "that I had a previous relationship with Mike Tollin as well as other producers, but at the time of the video I had no relationship with him, no connection, no business, nothing going on"; "to suggest that we had a relationship because we were doing a T.V. project, is completely false." (Mr. Duvoisin later testified that plaintiff told them "that he had worked with Mr. Tollin a while back" on a father/daughter sitcom, but that "the project went nowhere[.]")

The meeting concluded with plaintiff being told that his column was on suspension and "the investigators will be in touch[.]"

### 3. The Investigation: June 24 – August 7, 2013

Mr. Maharaj tasked business editor Marla Dickerson and Mr. Crawford with conducting the investigation. Mr. Crawford said their job was to "get the facts" about "whether there was a tie between" the video shoot (which Mr. Crawford believed was

20

"a staged production shoot") and the SBJ article "that said basically that shoot was to promote a show that was in the works."  Ms. Dickerson's job was to interview the people involved and Mr. Crawford's job was to "look at e-mails" and "see if there was a trail or correlation between the two."

Ms. Dickerson interviewed plaintiff, Mr. James, Wally Skajit and Bethany Mollenkoff (The Times's photographer and videographer, respectively), and Mr. Tollin.  (When Mr. Tollin received a message on July 2, 2013, that Ms. Dickerson had called him about the video and The Times's concerns about "how it came about, etc.," Mr. Tollin emailed plaintiff, asking "do you want to talk before I call her back?"  Plaintiff responded, "Yes – good idea.")

On July 10, 2013, Ms. Dickerson emailed a summary of her findings to Mr. Maharaj.  (The summary was prepared without reviewing any emails, which Mr. Crawford was handling.)  The Dickerson report concluded:  "My interviews with [plaintiff] and others involved in the Dwight Howard video have turned up no evidence of serious breaches of The Times Ethics Guidelines by [plaintiff].  The actions of Mandalay Sports Media are another story, but those folks aren't on our payroll."

On the issue of "[o]utside work" and the SBJ article, the Dickerson report stated its "[k]ey findings:  [Plaintiff] denied that any TV show is in the works and said the first he heard of it was when a couple of colleagues emailed him about the article.  He said he and Tollin had some casual conversations about a father-daughter story 'a couple of years ago' but that nothing ever came of it.  He said he was 'as dumbfounded as anyone' to hear about the article.  'There is no TV show,' [plaintiff] said.  'There is no agreement to do one.  There is no money that has exchanged

21

hands.' [¶] [Plaintiff] emailed me the photo of a text that he sent to Tollin on 6/11 asking what the heck was going on (it had 7 questions marks in it). [Plaintiff] said he concluded that Tollin 'embellished' the whole thing – a case of a Hollywood guy trying to puff himself up. [¶] That's pretty much the version Tollin gave, except that Tollin said the last time he and [plaintiff] had talked informally about a potential project may have been 2012. He said there was nothing to the S[B]J story, and characterized the whole thing as a misunderstanding. . . ."

Ms. Dickerson's "[f]inal thoughts" were that "Tollin has a pretty casual relationship with the truth, no question. But in the case of [plaintiff], until we find evidence to the contrary, we're obligated to take him at his word."

Mr. Duvoisin knew, from Ms. Dickerson's interview notes, that Mr. James told her that "[plaintiff] has tried to pitch this before [TV and movie projects]. This is something he's been trying to do for a long time. I never saw an issue. We allowed him to do that. We never stopped him from doing that. . . . Three to four times he mentioned it. He was trying to get one done without any success." As for the last time Mr. James remembered plaintiff talking about any project, Mr. James said, "As far as I know, a couple of years. It's not something that has been a continual topic. But it is a long-standing thing."

Paula Markgraf, then the director of human resources for The Times, was "pulled [in to] participate in" the investigation, specifically "to pull e-mails," on June 26. She did not have access to the email servers, and contacted the IT department in late June 2013 to download emails involving plaintiff. She received the emails on July 9, performed various searches, and reviewed and printed out "a rather thick set of e-mails" that she passed to

22

Mr. Crawford on July 12.  He in turn passed them to Mr. Duvoisin.  Mr. Duvoisin reviewed the emails and created a six-page summary of "what we had found by reviewing the e-mails and . . . what the issues were that they raised," and to "identify the things we wanted to ask [plaintiff] about."

The emails revealed plaintiff's activities in 2011 and 2012 that we have described in part 1.b., *ante*.  They also showed that plaintiff had written a column in May 2012 about a Norwegian Olympian about whom Mr. Tollin produced a documentary that was to air on ESPN; plaintiff sent a copy of the column to Mr. Tollin for his review before publication, and made two "rather innocuous changes" Mr. Tollin suggested before submitting the column for publication.  Then, Mr. Duvoisin's summary states, there was "a big gap" in "the email trail" until the Howard interview arrangements and ensuing video controversy in May 2013. Mr. Duvoisin later testified there were no email communications in 2013 suggesting that plaintiff had sold a show, was getting money, had "discussed this project," or that "suggested he was trying to do this video to help this project." (Plaintiff testified he had not spoken to Mr. Tollin about a television show in 2013, and the record shows only one email exchange with Mr. Tollin in 2013 before the Howard video matter, and that had nothing to do with a television show.)

Mr. Duvoisin concluded that plaintiff had been "untruthful with us about several things," including statements that Mr. Tollin was "an old friend, and they'd talked casually about a TV project long ago" (plaintiff had met Mr. Tollin two years ago and the work they did was "very serious").  Mr. Duvoisin also doubted plaintiff's claim that he had not read the SBJ article, and observed that plaintiff and Mr. Tollin "appeared to have

23

coordinated their story" that the article was erroneous.  Nor did plaintiff tell his editors about his June 11 pitch to Mr. Tollin about a weekly webcast "just weeks ago."  Mr. Duvoisin concluded plaintiff violated The Times's newsroom ethics guidelines by "show[ing] stories to interested outside parties before publication"; by pitching the weekly webcast to an outside party without his editors' approval or knowledge; and, if he had "sold" a sitcom in 2011, he did not disclose the outside income as required.  Mr. Duvoisin proposed a number of questions to ask plaintiff and others.

Meanwhile, on July 12, 2013, plaintiff wrote to Mr. Maharaj about The Times's "disregard for the stress, impact on my health and potential damage to my reputation."  Plaintiff said he did not understand "the delay in this process, which heightens my suspicion something else is at work here."  Plaintiff stated he was leaving on a vacation the following day and would return on July 24, and asked that matters be resolved at that time.

When plaintiff returned, a meeting was set for July 25, 2013, and plaintiff was told "a human resources person would be attending the meeting."  He "cleaned out [his] desk, anticipating" a termination.  He then met with Mr. Maharaj and Mr. Duvoisin, who told him the investigation was still ongoing, and set a meeting for July 30, 2013.

At the July 30 meeting, Ms. Markgraf was also present, and the three of them questioned plaintiff.  Mr. Duvoisin suggested plaintiff had not been truthful.  Plaintiff said "they couldn't get it through their heads that when I said, 'there is no script,' I was referring directly to the accusation that there was a T.V. show, a business relationship with Mandalay Sports Media."

24

On July 31, 2013, Ms. Markgraf emailed Mr. Maharaj, urging a final decision as soon as possible, saying: "[Plaintiff] made a good case for this dragging out as well as causing stress and harm to his reputation. I have seen many emails in his inbox asking what is happening from the public, including questions whether he is being fired."

Messrs. Duvoisin and Maharaj and Ms. Markgraf met again with plaintiff on August 7, 2013, to discuss "discrepancies" and "to ask more questions about them." They showed plaintiff about a dozen emails and the January 2011 script, and "they were trying to link this 2011 script to 2013, the Dwight Howard video . . . ." Mr. Maharaj told plaintiff, " 'I've lost trust in you.' " Plaintiff told Mr. Maharaj that he had done nothing to merit that kind of comment, and he "was losing trust in them as my superiors[.]" It "clearly appeared to [plaintiff] that they were operating off of some plan because it didn't matter what I said." Ms. Markgraf said, " 'These two gentlemen will have to figure out your fate. One of the possibilities is termination." Plaintiff "was numb at that point."

4.    **The August 8, 2013 Demotion**

The four met again the following day, August 8, and on the same day plaintiff received a "final written warning." Plaintiff was told, both orally and then in writing, that "[e]ffectively [*sic*] immediately, you are no longer a columnist. After your pending vacation, you will be a Reporter II on the sports staff. There will be no reduction in your salary at this time."[1]

---

[1]    Mr. Duvoisin testified that "Reporter II is a senior reporter at the L.A. Times. It is the job in which most of our most experienced staff hold that rank of Reporter II including . . . maybe six Pulitzer Prize-winning reporters. [I]t would be one of

At the meeting, Mr. Duvoisin told plaintiff he "had broken the ethics code for not having permission to shop different projects around or . . . get involved in outside activities" and "for passing columns"; that he had "lost the trust of the editors" and "had . . . not been forthcoming in answering questions"; and "mentioned again the notion of a public embarrassment to the L.A. Times." The written warning also stated that "[n]ot reporting the outside activities during the 2010, 2011 and 2012 annual review of the Tribune Business Code of Conduct is also a violation of company policy." The only mention of the Dwight Howard video was this: "Before any of the issues arose that led to an investigation of your activities, we had been concerned about the quality and tone of your column and about your public behavior. As you recall, we met separately with you and your editors on several occasions in May 2013 to discuss our concerns – well before the Dwight Howard video surfaced."

## 5.    Post-demotion Developments

After the August 8, 2013 meeting, plaintiff did not return to work. About a week after the meeting, The Times received a letter from plaintiff's lawyer stating that plaintiff believed he had been constructively discharged. "[R]elatively soon" after that, the then-publisher and chief executive officer of The Times, Eddy Hartenstein, asked Mr. Duvoisin and Mr. Maharaj to reconsider whether plaintiff could resume his column. They did so, and met with plaintiff on September 4, 2013, telling him "they wanted [him] back." But when he asked how many columns he would write and whether he had to change his interviewing approach, they told him they would discuss that when he returned. He

---

the most sought after positions you could have to be a senior reporter on the staff of the L.A. Times."

questioned their motives and did not trust them. A proposed contract "demand[ed] that I admit to wrongdoing" and was a "one-year . . . guaranteed contract" and "after the first three months, they could get rid of me . . . for no cause" but with the obligation to pay him for the rest of the year. (This proposed contract is not in evidence.)

The next day, plaintiff met with editors at the Orange County Register, and by September 9, 2013, had accepted a position as a columnist there. The Register later experienced financial problems, and in June 2014 plaintiff accepted a buyout (three months' severance pay in exchange for resignation) that the Register offered to its staff in advance of preparation of a layoff list.

**6.     The Lawsuit**

Plaintiff filed this lawsuit on October 15, 2013. In addition to the facts recited above, the evidence adduced during the 28-day trial included the following points.

**a.     Discrimination/pretext issues**

Mr. James testified that plaintiff's "sense of journalistic ethics has been strong throughout" his career, and Mr. Dwyre, who was plaintiff's supervisor for many years and after that a fellow columnist, testified that the incident in June 2013 "was the first time that there was any ethical question about" plaintiff.

Kelly Bassin (formerly Kelly Burgess), who worked at The Times from 1983 until March 2012 and was Mr. James's assistant from July 2009 until she left, testified about the layoffs she witnessed in the five years before she left (30 to 40 employees). She noticed that "they seemed to be targeting and focusing on older, more long-term coworkers of mine, people who had been there for some time and were likely higher salaried

27

employees." Mr. James "confided in [her] that he was specifically told to target certain people, the older, higher salaried employees."

Mark Heisler was a columnist for The Times from 1991 to 2011, when he was involuntarily laid off at the age of 67. One of the reasons cited by Mr. Cherwa for Mr. Heisler's termination was that "we could maybe save another job. We could save someone who wasn't, you know, . . . in that near retirement position." (Mr. Cherwa asserted that Mr. Heisler "had already said he planned to retire . . . ." At the time of trial, Mr. Heisler was a freelance correspondent with L.A. News Group and a freelance blogger for Forbes.com.)

After plaintiff left, Mr. James planned to request two new hires. Mr. James wanted to hire Steve Dilbeck, a versatile and solid writer, 61 years old, who was "very . . . plugged in to the sports scene in Los Angeles," for one of the positions, and the other would be "someone younger." Mr. James told Mr. Dilbeck that "the average age of our staff is 53," and "we have to get younger." Mr. Maharaj and Mr. Duvoisin made the ultimate hiring decisions. Two men, one in his 20's and one in his 20's or 30's, were hired. One of them came in at a "fairly high salary," but "less than half" of plaintiff's salary.

Plaintiff testified that many of the employees "being asked to leave" during the preceding five years "were close to my age," so "I was aware that an older crowd . . . was being shown the door."

b.    **Damages issues**

Plaintiff presented extensive evidence of his emotional distress and worry about damage to his reputation during the investigation. He conveyed this to Mr. Maharaj as early as

July 2, saying he was forced to avoid readers, friends and associates during the wait and there was already a rumor he was leaving the paper.  He did so again on July 12, telling Mr. Maharaj he was "dumbfounded by the disregard for the stress, impact on my health and potential damage to my reputation" in the month since he had been told to stop writing.

In addition to his own testimony, his wife and daughter testified about plaintiff's stress, confusion, irritability and reclusiveness during the column suspension, and his depression and withdrawal after the loss of his column.  The defense's forensic psychologist (Dr. Francine Kulick) testified plaintiff developed "an adjustment disorder with features of anxiety and depression at the end of May 2013," and diagnosed plaintiff with major depressive disorder in the severe range as of October 2014.  She testified plaintiff "had an emotional reaction to the loss of prestige and recognition due to his decision to no longer work at the L.A. Times[.]"  Plaintiff's expert psychiatrist, Dr. Warren Procci, also presented testimony on this subject (including that plaintiff "certainly was already experiencing a very good deal of depression at the time that he quit.  Now, it may be the case that the fact of quitting . . . did contribute to the depression worsening").

We will discuss this and other evidence on noneconomic damages as necessary in connection with the legal issues on appeal.

c.      **The special verdict and postjudgment orders**

The jury found in favor of plaintiff on his claims of disability and age discrimination, and on his claim of constructive termination.  The jury was directed to award past and future economic damages only if it found plaintiff was constructively

29

terminated.  The jury awarded past economic damages of $330,358 and future economic damages of $1,807,033.  The jury found past noneconomic loss of $2,500,000 and future noneconomic loss of $2,500,000.  The jury found that plaintiff did not prove by clear and convincing evidence that The Times acted with malice, oppression or fraud.

Judgment was entered on November 5, 2015.  Defendant filed motions for JNOV and for a new trial.

The trial court granted defendant's motion for JNOV on the claim for constructive termination and denied the JNOV motion on the claims for age and disability discrimination.

The court also granted defendant's motion for a new trial "on the claim for constructive discharge (termination) and all damages, economic and noneconomic, assessed and based on that claim."  The court denied the new trial motion as to the age and disability discrimination causes of action, stating that the "motion for a new trial is denied on all grounds other than the ground of the insufficiency of the evidence to sustain a claim of constructive discharge and the award of damages, economic and noneconomic, addressed in this ruling."

Plaintiff appealed from the posttrial orders granting in part defendant's JNOV and new trial motions. Defendant appealed from the orders denying in part defendant's JNOV and new trial motions.

### DISCUSSION

1. **Plaintiff's Appeal**
   a. **The JNOV ruling on constructive discharge**
      i. **The standard of review**

"A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light

30

most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  On appeal, "the standard of review is whether any substantial evidence--contradicted or uncontradicted--supports the jury's conclusion." (*Ibid.*)

### ii.    The law on constructive discharge

"Constructive discharge occurs when the employer's conduct effectively forces an employee to resign.  Although the employee may say 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will.  As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244-1245 (*Turner*).)

To establish a constructive discharge, an employee must prove "that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner, supra,* 7 Cal.4th at p. 1251.)

*Turner* further tells us that, "[i]n order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner, supra,* 7 Cal.4th at p. 1247; see *id.* at p. 1246 ["The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee."].)  "[A] poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (*Id.* at

31

p. 1247; see also *Gibson v. Aro Corp.* (1995) 32 Cal.App.4th 1628, 1635 (*Gibson*) [employee's demotion does not constitute constructive discharge].)  But, as the court observed in *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454 (*Scott*), "*Turner* did not hold . . . that a demotion can never be the basis for a wrongful termination."  (*Id.* at p. 468, fn. 3; see *ibid.* [observing that the question "whether a demotion may be so drastic or punitive as to constitute a constructive discharge" was not before the *Scott* court].)

The standard by which a constructive discharge is determined "is an objective one, and the proper focus is on the working conditions themselves."  (*Gibson, supra,* 32 Cal.App.4th at p. 1637, citing *Turner, supra,* 7 Cal.4th at pp. 1248, 1251; see *ibid.* ["Bruised egos and hurt feelings are not part of the *Turner* equation."].)

### iii.    Contentions and conclusions

Plaintiff contends he "proved that his punitive demotion was accompanied by aggravating conditions."  By this we understand him to mean that there was substantial evidence his demotion, together with circumstances preceding it, constituted adverse working conditions that – as the jury was instructed – were "unusually aggravated or involve[d] a continuous pattern of mistreatment," thus making the situation intolerable and effectively coercing his resignation.  (See *Turner, supra,* 7 Cal.4th at p. 1247.)  We do not find such evidence in the record.

Plaintiff lists, as the intolerable conditions that forced him to resign, the following:  (1) the May 28 reduction in his columns from three to two per week; (2) Mr. Duvoisin's statement to Mr. James (conveyed to plaintiff at the May 28 meeting with Mr. James) that plaintiff was a "public embarrassment" to The

32

Times; (3) Mr. Duvoisin's criticism, conveyed at the May 28 and May 29 meetings, that plaintiff's writing was sloppy and not up to The Times's standards; (4) "[f]alse accus[ations] of unethical conduct"; (5) the suspension of his columns "for an unreasonable 55 days" (June 24 to August 8); (6) on June 24, plaintiff was "told not to say anything" about the investigation, so he could not "explain himself to his sources . . . and fans, damaging his journalistic resources"; (7) he was "[d]amaged in his professional reputation with his column inexplicably absent for two months"; (8) his demotion to an "entry-level assignment position, based upon false policy violations resulting from discriminatory motives"; (9) the August 8 final warning that "placed [him] on a performance plan warning of potential termination"; and (10) the September 4 offer of "an ambiguous columnist position, reporting to editors who falsely accused him and called him untrustworthy."

We conclude, as a matter of law, that none of these circumstances, alone or in combination, amount to working conditions that are either unusually aggravated or a continuous pattern of mistreatment. There is no evidence to support some of them. Others consist only of plaintiff's subjective reaction to standard employer disciplinary actions – criticism, investigation, demotion, performance plan – that, even if undertaken for reasons (plaintiff's age and disability) later found to include discrimination, are well within an employer's prerogative for running its business. Unless those standard tools are employed in an unusually aggravated manner or involve a pattern of continuous mistreatment, their use cannot constitute constructive discharge.

We begin with two points of clarification.

33

First, there was, as the trial court found, substantial evidence that plaintiff's age and disability were "substantial motivating reason[s]" for the adverse employment action or actions to which plaintiff was subjected.  But the discriminatory motive for plaintiff's working conditions has no bearing on whether the evidence was sufficient to establish constructive discharge.  (See *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 905 ["The question . . . is not whether there was [unlawful gender] discrimination [the jury found there was, and the court upheld punitive damages], but whether the discriminatory working conditions were so extreme as to coerce a reasonable employee to resign, thereby constituting a constructive discharge"; "[u]nder the objective test set out in *Turner*," the trial court correctly ruled the plaintiff's resignation was not a constructive discharge as a matter of law].)

Second, the record is clear on this point:  The publication of the SBJ article provided a legitimate basis for an inquiry by defendant, because it suggested the possibility that the video of the Dwight Howard interview was being used to promote an outside business arrangement between plaintiff and Mr. Tollin for the creation of a television show.  While the evidence may allow inferences of additional motives, no reasonable juror could conclude that defendant was not entitled to undertake an investigation.  Plaintiff's personal reaction to that investigation or to his demotion cannot provide a basis to conclude that plaintiff's working conditions were "unusually aggravated" or that there was a "continuous pattern of mistreatment."  As *Gibson* expressly states, "[u]nder *Turner*, the proper focus is on the working conditions themselves, not on the plaintiff's *subjective* reaction to those conditions."  (*Gibson, supra,* 32

Cal.App.4th at p. 1636; see *ibid.* ["[The plaintiff's] embarrassment about working as a sales representative does not convert his demotion into a constructive discharge," and "People who are demoted naturally have new job responsibilities, new supervision, and lower pay. Inferentially, that is what is supposed to happen when one is demoted."].)

With those principles in mind, it is plain the evidence did not support intolerable working conditions forcing plaintiff's resignation.

The first three items plaintiff lists (the column reduction, and Mr. Duvoisin's criticisms of plaintiff as a "public embarrassment" and for sloppy writing) do not remotely resemble "unusually aggravated" working conditions. Criticism of an employee's job performance, even " 'unfair or outrageous' " criticism, " 'does not create the intolerable working conditions necessary to support a claim of constructive discharge.' " (*Gibson, supra,* 32 Cal.App.4th at p. 1636, italics omitted.)

The fifth, sixth and seventh items (the suspension of his columns "for an unreasonable 55 days," during which he was "told not to say anything" about the investigation, thus damaging his journalistic resources and his professional reputation) find no support in the evidence. His column was suspended, but there was no evidence of any unreasonable delay in the investigation. Nor was there any evidence of damage to his sources or to his reputation. The evidence plaintiff cites for this is that he was worried about his reputation, and received many emails (from "everybody from big-time athletes to readers" who "wanted to know why [he was] not writing," including "questions whether he is being fired." While this is evidence of plaintiff's own stress and concern, it is not evidence of damage to his reputation or to his

35

relationships with his sources. As the trial court aptly stated, plaintiff's avoidance of business associates and readers while awaiting the outcome of the investigation is not evidence of "an improper action or any resulting intolerable working conditions. Necessarily, when an employer undertakes a review of an employee's conduct, there will be a passage of time before an investigation can be completed and it would be expected the employee would experience anxiety."

A similar conclusion applies to plaintiff's fourth item ("[f]alse accus[ations] of unethical conduct"). Certainly there was conflicting evidence, and the jury could properly find plaintiff did not, in fact, engage in any unethical conduct. But an investigation into that issue does not create the "sufficiently extraordinary and egregious" conditions (*Turner, supra,* 7 Cal.4th at p. 1246) necessary to trigger a constructive discharge. The record fully supports the trial court's conclusion there was no evidence that any damage to plaintiff's reputation "was occurring or eventually occurred." As the court pointed out, "There was no evidence that anyone in the workplace, beyond those involved in the investigation, knew of any allegations of ethics violations. Employee matters, including investigations, are considered to be confidential and there was no evidence that such confidentiality was breached at any time."[2]

---

[2]     Plaintiff points to Mr. Dwyre's testimony that reputation is "huge" in the newspaper business and an alleged ethical violation can be "death" to a columnist's career. No doubt that is so, but that has no bearing where there is no breach of confidentiality. And, as the trial court pointed out, Mr. Dwyre did not testify that *any* kind of ethical violation would have that effect. ("All of the so-called ethics violations that were potentially involved in this investigation related to the internal operations of the

Finally, the eighth, ninth and tenth items (plaintiff's demotion to an "entry-level" position, placement on a performance plan, and the post-resignation offer to restore his column) likewise are not evidence of "unusually aggravated" working conditions or a "pattern of mistreatment." (There is no evidence plaintiff was demoted to an "entry-level" position – only plaintiff's own perception that he was demoted from "the top of the hill down to the bottom." And the offer to return plaintiff to his position as columnist occurred after his resignation and could not have contributed to it.) As we have already observed, *Turner*, and cases before and after it, all tell us that demotion cannot by itself trigger a constructive discharge. Neither can a performance plan, which is a natural accompaniment to a demotion.

Plaintiff contends that a demotion when coupled with other circumstances may amount to "unusually aggravated" working conditions or to a continuous pattern of mistreatment, citing *Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156 (*Thompson*) [concluding substantial evidence supported the jury's constructive discharge finding].) Specifically, plaintiff points to *Thompson*'s rejection of the employer's "attempts to slice into separate incidents – and to evaluate individually – evidence from which the jury could and clearly did find a 'continuous pattern' of conduct on the part of [the employer]." (*Id.* at p. 1168.)

*Thompson* does not help plaintiff. In *Thompson* (which did not involve a demotion), there was evidence the plaintiff's

newspaper[,] and not to relationships with those outside such as maintenance of confidentiality or accurate and truthful reporting of what was said or occurred. As a matter of common sense, it is the latter that has the potential of compromising the reputation of a columnist or reporter.")

supervisor "intentionally had made it impossible for [the plaintiff] to do her job through a continuous course of intimidation and harassment." (*Thompson, supra*, 86 Cal.App.4th at p. 1170.) *Thompson* observed that "employers have the right to unfairly and harshly criticize their employees, to embarrass them in front of other employees, and to threaten to terminate or demote the employee." (*Id.* at p. 1171.) But "a continuous course of such actions, uncorrected by management, can constitute objectively intolerable working conditions." (*Ibid.*) Citing the *Turner* standard (" 'adverse working conditions must be unusually "aggravated" *or* amount to a "continuous pattern" ' "), *Thompson* concludes: "Implicit in this disjunctive formulation is that even though individual incidents in a campaign of harassment do not constitute justification for an employee to resign, the overall campaign of harassment can constitute such a justification." (*Thompson,* at p. 1172.)

This case is nothing like *Thompson*. The evidence plaintiff cites does not show an "overall campaign of harassment," as it did in *Thompson*. It shows meetings conveying criticisms (that plaintiff found insulting); suspension of plaintiff's columns while an investigation was conducted (causing plaintiff anxiety and depression); the investigation (which plaintiff felt was "unfair" and "unreasonable," but during which, as the trial court found, "[t]here was no evidence that at any time . . . he was the object, directly or indirectly, of any criticism, hostility or harassment"); and the ultimate demotion and final warning (performance plan), in which The Times indicated the investigation's findings of ethical violations had "damage[d] our trust in you and in your suitability to serve as a Times columnist" (a conclusion with which plaintiff disagreed).

38

In short, the evidence showed only plaintiff's personal, subjective reactions to defendant's use of standard disciplinary procedures: criticisms, a suspension, an investigation, and demotion with a performance plan – all performed with no breach of confidentiality and with no harassment or other mistreatment of plaintiff. While the evidence allowed the inference that age or disability discrimination was a motivating factor in one or more of defendant's actions, nothing in the conveyance of the criticism, the performance of the investigation, or the resulting demotion and performance plan reflected any "unusually aggravated" working conditions or the "continuous pattern of mistreatment" necessary for a constructive discharge. It is the working conditions themselves – not the plaintiff's subjective reaction to them – that are the sine qua non of a constructive discharge. (See *Gibson, supra,* 32 Cal.App.4th at p. 1636.)

Plaintiff insists that *Turner*'s objective standard means we must assess the evidence of "whether conditions were intolerable" from the point of view of a "prominent columnist for [a] national publication" – not from the point of view of "reasonable employees generally." He points out he was "a public figure in an influential position, whose actions and absences were observed by the journalism world, his sources and the public at large," so the jury "properly considered evidence of [his] own emotional distress" in deciding "whether a reasonable person in his position would have found his working conditions similarly intolerable." He concludes there was substantial evidence that "[his] situation had become so intolerable that he could not continue working for these men who had discriminated against him and impugned his integrity."

Plaintiff's contention is simply contrary to law, which imposes an objective standard, and requires "the proper focus [to

39

be] on the working conditions themselves," and "not on the plaintiff's *subjective* reaction to those conditions." (*Gibson, supra,* 32 Cal.App.4th at pp. 1636, 1637.) The standard does not change merely because of the employee's prominence. To hold otherwise could turn any employer investigation of a well-known employee into a constructive discharge, and eviscerate the requirement the employee show "sufficiently extraordinary and egregious" conditions (*Turner, supra,* 7 Cal.4th at p. 1246) to trigger a constructive discharge.

In the end, the evidence merely shows, as the trial court concluded, plaintiff's "own reaction to the fact of an investigation in which The Times sought information from others instead of accepting his own version of events." The evidence shows plaintiff's loss of trust and confidence in his superiors at The Times, but "[t]his is also his personal response from the fact that he believes that he did nothing wrong."

In short, the record is devoid of evidence that defendant intentionally created or knowingly permitted "working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner, supra,* 7 Cal.4th at p. 1251.) Accordingly, the trial court did not err in granting defendant's JNOV motion on plaintiff's constructive discharge claim, and we need not consider the court's alternative order granting a new trial on that claim.

### b. The ruling granting a new trial on damages
### i. The standard of review

"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be

40

disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 (*Jiminez*).) A new trial order " 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' " (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412.)

### ii. Background

In addition to granting defendant's JNOV motion on the constructive discharge claim, the trial court granted defendant's motion for a new trial "on the claim for constructive discharge (termination) and the damages assessed on that claim." The court denied the new trial motion "on all grounds other than the ground of the insufficiency of the evidence to sustain a claim of constructive discharge and the award of economic damages addressed in this ruling."

The next day, January 5, 2016, defendant filed an ex parte application to clarify the court's ruling "to expressly state that The Times motion for a new trial as to noneconomic damages is granted." Defendant pointed out that plaintiff's "alleged adverse employment actions supporting noneconomic damages are substantially interwoven with the now-defunct constructive discharge claim . . . ."

Plaintiff had no opportunity to respond in writing (because January 5, 2016, was the last day the court had jurisdiction to modify its ruling), but counsel were heard fully at a hearing on

41

that day.  The court observed the application was "legitimately a motion for clarification because . . . at no place in the ruling did I specifically mention the noneconomic damages."

After all counsel presented their arguments, the court granted the ex parte application, stating the "application is granted and I will clarify."  The court concluded:  "The clarification will be that I said all damages in several parts. I meant 'all damages.'  I did not address specifically the reason why it is all damages, but I think the clarification calls for it and I will so clarify."  The court's minute order states, "It was the court's intention that the noneconomic damages should be included because it is not possible to determine what amount, if any, the jury awarded because of a constructive discharge."

Later that day, the court issued an amended ruling, adding this explanation:  "[T]he granting of the motion for a new trial includes the issue of the noneconomic damages awarded on the ground that it is not possible to determine what portion, if any, of said damages was based on the claim of a constructive discharge which is an adverse employment action.  There was substantial evidence of [plaintiff's] emotional distress arising from the events that are the basis of his claims of discrimination.  Those claims, however, included his distress arising from the conditions that he considered to be the basis of a constructive discharge and the effect and consequences of that discharge on his emotional health.  It is not possible to separate what damages may have been awarded for the discrimination alone from what noneconomic damages were awarded that included a constructive discharge.  It is probable that the jury's award of noneconomic damages included some compensation for the constructive

42

discharge which is an event of a very different character than a voluntary resignation."

### iii. Contentions and conclusions

Plaintiff contends the trial court made an error of law when it concluded it was impossible to determine "what amount, if any, the jury awarded because of a constructive discharge." For the proposition that the court's ruling was based on a mistaken conclusion of law, plaintiff cites *Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324. That case stated that " '[w]hether a plaintiff "is entitled to a particular measure of damages is a question of law subject to de novo review," ' " while the amount of damages is a fact question. (*Ibid.*, see *id.* at p. 1329 [issue was proper measure of damages for medical expenses in suit by an uninsured plaintiff].)

We fail to see the relevance of *Bermudez* to the trial court's ruling: that it was impossible to determine what *amount* of noneconomic damages the jury would have assessed in circumstances where, as a matter of law, plaintiff's decision to resign after his demotion was voluntary, not coerced. While plaintiff insists the ruling rested on an error of law, he provides no cogent explanation of the alleged error.

First, he asserts he "was denied his due process rights" because he had no opportunity to respond in writing to defendant's ex parte application to clarify the court's ruling. Plaintiff cites no authority for, and no further discussion of, his due process claim, and accordingly we do not consider it further. As noted above, plaintiff was heard fully at the hearing, and he did not claim in the trial court that he was denied due process.

Second, plaintiff repeatedly asserts that constructive discharge was a legal theory, not a separate cause of action – that

is, his constructive discharge was one of the several adverse employment actions defendant took against him, all based on his age and disability. In fact, plaintiff alleged a separate cause of action, but in the end the court and all parties agreed it was unnecessary to give the CACI instructions on all the elements of constructive discharge in violation of public policy. Instead, the court and all parties agreed to give only a modified version of CACI No. 2510 explaining the phrase "constructive discharge." The court and all parties agreed that plaintiff needed to maintain his claim for constructive discharge in violation of FEHA in order to recover economic damages. We find no relevance in plaintiff's proposition that constructive discharge was a "finding" and "not a separate cause of action."

Plaintiff makes another confounding argument to the effect that the jury found his demotion was discriminatory; the evidence supporting his discrimination claims included "the same conduct on which the legal theory of constructive discharge was based"; and even if defendant's conduct was insufficient to prove constructive discharge, that conduct "did not become inadmissible to prove [plaintiff's] FEHA claims, and all damages resulting from discriminatory adverse conduct including demotion are recoverable." All that may be so, but the question is not the admissibility of the evidence of defendant's conduct (or the recoverability of all damages "resulting from" that conduct). The question is the amount of damages for emotional distress that actually did "result[] from" the discriminatory demotion – as opposed to the emotional distress that may have resulted from plaintiff's own decision to resign (and his later decision not to accept defendant's offer to return him to his position as columnist).

There was evidence, for example, of plaintiff's stress and anxiety during the column suspension, but there was also testimony about an increase in his depression after he left The Times. As recounted earlier, the defense's forensic psychologist testified plaintiff "had an emotional reaction to the loss of prestige and recognition due to his decision to no longer work at the L.A. Times," and plaintiff's expert psychiatrist also testified that "it may be the case that the fact of quitting . . . did contribute to the depression worsening." There was also testimony that plaintiff's symptoms improved when he went to work for the Orange County Register, and he was eventually more depressed after leaving the Register.

In short, we agree with the trial court's conclusion that it is impossible to separate "what damages may have been awarded for the discrimination alone from what noneconomic damages were awarded that included a constructive discharge" – that is, damages for plaintiff's distress arising from "the effect and consequences of that discharge," an event "of a very different character than a voluntary resignation."[3] There was no error in the trial court's ruling.

---

[3] Plaintiff also suggests that "[i]f any ambiguity theoretically resulted from the damages questions in the Special Verdict, then Defendant invited that error and is prevented from attacking the Special Verdict." This claim is baseless. The comments of defense counsel that plaintiff cites (merely confirming plaintiff "could be discriminated against but not constructively terminated and have emotional distress damages") occurred on October 28, 2015, when the parties first discussed with the court their respective drafts of the special verdict form. The following day, after further discussions during the morning session and at the beginning of the afternoon session, the clerk handed the court a

## 2.  Defendant's Appeal

Defendant contends the trial court should have granted its JNOV motion on all of plaintiff's claims, because plaintiff "did not suffer an adverse employment action." Alternatively, defendant contends the court should have granted a new trial on liability for plaintiff's discrimination claims, "untainted by [plaintiff's] erroneous constructive discharge theory." We disagree with both contentions.

### a.  The ruling denying JNOV on plaintiff's age and disability discrimination claims

As discussed above, our review of the trial court's denial of defendant's JNOV motion is limited to whether any substantial evidence supports the jury's conclusions. Defendant's argument on appeal further limits our review, because defendant's sole claim is that plaintiff "did not experience an adverse employment action," and so his discrimination claims "fail as a matter of law." We do not agree.

Defendant's claim depends on an insupportable characterization of both the facts and the law.

First, defendant characterizes plaintiff's demotion from columnist to reporter as a "proposed reassignment" and a "temporary reassignment to senior reporter" that "never took effect." That is not what happened. On August 8, 2013, plaintiff was told, both orally and in a "final written warning," that he was no longer a columnist, "effective immediately."

---

verdict form, and both parties told the court that they agreed upon the verdict form. Indeed, in his opening brief on appeal, plaintiff states, "Both parties agreed upon the Special Verdict Form."

Second, there was ample evidence that the position of columnist was significantly different from and far more prestigious than that of reporter.  As defendant necessarily concedes, a job reassignment may be an adverse employment action when it entails materially adverse consequences.  (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 393 (*McRae*) [in a lateral transfer where a plaintiff " 'suffers no diminution in pay or benefits,' " the plaintiff does not suffer an actionable injury " 'unless there are some other materially adverse consequences . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm' "]; see *White v. Burlington Northern & Santa Fe Railway Co.* (6th Cir. 2004) 364 F.3d 789, 803 (*White*) [transferring the plaintiff "from her forklift operator job to a standard track laborer job" that paid the same was an adverse employment action; the new position was "more arduous" and " 'dirtier' " and the forklift position "required more qualifications, which is an indication of prestige"; "[i]n essence, . . . the reassignment was a demotion"].)  Such " 'materially adverse consequences' " (*McRae,* at p. 393) are apparent here.

In short, defendant's action was not a "proposed reassignment"; it was "effective immediately" and it was entirely reasonable for jurors to conclude the change from columnist to reporter was necessarily accompanied by " 'materially adverse consequences.' " (*McRae, supra,* 142 Cal.App.4th at p. 393.) Unlike *McRae*, here the "proposed reassignment" involved "a change in status [and] a less distinguished title," and a "significant change in job responsibilities." (*Ibid.*)  Testimony from plaintiff, Mr. Dwyre and others confirmed that the position of columnist was "the most prestigious writing position" at the

47

newspaper, and "very different from a reporter, reporter II position at the paper," giving the columnist "wide discretion" on writing topics. (Indeed, Mr. Duvoisin's "final written warning" describes a Times columnist as "a privileged position in which a writer enjoys great latitude.") The change from columnist to reporter was plainly a demotion, and certainly amounted to "a tangible injury supporting a claim of adverse employment action." (*McRae*, at p. 394; see *Burlington Industries, Inc. v. Ellerth* (1998) 524 U.S. 742, 761 ["[a] tangible employment action constitutes a significant change in employment status, such as . . . reassignment with significantly different responsibilities"].)

Defendant insists that "before [plaintiff] ever worked a single day in his new position, The Times decided to restore [plaintiff's] column." Consequently, defendant concludes, plaintiff's "temporary reassignment to senior reporter" was not "sufficiently final to constitute an adverse employment action," citing *Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 930 (*Brooks*), and *Dobbs-Weinstein v. Vanderbilt University* (6th Cir. 1999) 185 F.3d 542, 546 (*Dobbs-Weinstein*). This contention ignores other facts, and the cited authorities do not support it.

The reason plaintiff did not "work[] a single day in his new position" is that he chose to leave The Times rather than accept the demotion. It is undisputed that he never returned to work after August 8, 2013, and that four days later, his lawyer advised The Times that plaintiff considered himself to have been constructively discharged. While we have concluded there was no constructive discharge, there was certainly a de facto voluntary resignation. Plaintiff's refusal to accept The Times's later offer – to "bring [plaintiff] back to the L.A. Times" – may affect the damages he can recover, but that belated offer cannot change the

48

nature of defendant's employment action. His demotion was "effective immediately," and by its own terms was a "final written warning" that ended with the advisement that The Times would "keep an eye on [plaintiff's] performance going forward" and that compliance with the listed performance expectations "will be necessary to ensure that any additional disciplinary measures up to and including termination are not necessary." Plaintiff never returned to work, and the purpose of the September 4 meeting was to "discuss [plaintiff] returning." Under these circumstances, no reasonable person would view The Times's August 8 action as a "proposed reassignment" that "never took effect."[4]

*Brooks* and *Dobbs-Weinstein* do not support defendant's assertion that plaintiff "did not experience an adverse employment action." *Brooks* was a retaliation case, and the plaintiff "allege[d] that her performance review was downgraded from 'satisfactory' to 'needs improvement' because of her complaint about [an episode of sexual harassment by a coworker]." (*Brooks, supra,* 229 F.3d at p. 929.) The court observed that "an undeserved negative performance review can constitute an adverse employment decision." (*Ibid.*) But in *Brooks*, the evaluation "was not an adverse employment action because it was subject to modification by the [employer]." (*Id.* at pp. 929-930.) (The plaintiff had refused to accept the review and submitted a written appeal to her employer, expressing her view that the evaluation was intended to retaliate against her for

---

[4]     This conclusion makes it unnecessary to consider the parties' debate over whether defendant's various actions preceding the demotion (reduction in columns, allegedly unwarranted criticism, and so on) amounted to adverse employment actions.

complaining about the coworker's harassment. While her employer was considering her appeal, the plaintiff "left work and never returned." (*Id.* at p. 922.)) The court concluded that, "[b]ecause the evaluation could well have been changed on appeal, it was not sufficiently final to constitute an adverse employment action." (*Id.* at p. 930.)

The differences between *Brooks* and this case are clear. *Brooks* does not support the proposition that plaintiff's demotion was "subject to modification" and "not sufficiently final." Plaintiff had no internal appeal; his demotion, which was "effective immediately," followed a thorough investigation during which his column was suspended and which reached negative conclusions about plaintiff's compliance with defendant's professional standards. *Brooks* does not support defendant's claim.

The *Dobbs-Weinstein* case does not help defendant either. Indeed, the Sixth Circuit effectively disavowed *Dobbs-Weinstein* in *White, supra,* 364 F.3d 789.[5] In *White,* the *en banc* court held "that a thirty-seven day suspension without pay constitutes an adverse employment action regardless of whether the suspension is followed by a reinstatement with back pay." (*Id.* at p. 791.)[6]

---

[5] The *White* decision was affirmed in *Burlington Northern & Santa Fe Railway Co. v. White* (2006) 548 U.S. 53, 57, 70-72.

[6] *White* explained that in *Dobbs-Weinstein* (a case involving denial of tenure), "[d]espite the facts that [the plaintiff] was initially denied tenure and her employment ended temporarily, this court held that [the plaintiff] had not suffered an adverse employment action cognizable under Title VII. . . . We relied upon the fact that Vanderbilt reversed the decision of its dean and granted [the plaintiff] back pay as the result of its internal grievance procedure. [Citation.] This reversal, we reasoned, was

In sum, there is no legal support for defendant's assertion that plaintiff suffered no adverse employment action as a matter of law.  Both the law and substantial evidence show otherwise.  Defendant offers no other basis for finding error in the trial court's denial of its JNOV motion on plaintiff's discrimination claims, and we therefore affirm the ruling.

### b.     The ruling denying a new trial on plaintiff's age and disability discrimination claims

Defendant contends the trial court should have granted a new trial on liability for plaintiff's discrimination claims "untainted by [plaintiff's] erroneous constructive discharge theory."  Again, we find no merit in this claim.

As already stated, a trial court's ruling on a new trial motion "will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."  (*Jiminez*, *supra*, 4 Cal.3d at p. 387.)  The same is true of a ruling limiting a new trial to the issue of damages.  (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 285 (*Liodas*) [" 'A new trial limited to the damage issue may be ordered where it can be reasonably said that the

_____

the 'ultimate employment decision.' [Citation.]  We held that 'intermediate' tenure decisions that are appealable through a tenure review process cannot form the basis of a Title VII claim." (*White, supra,* 364 F.3d at pp. 800-801.)  But, after reviewing later authorities, the *White* court "now join[s] the majority of other circuits in rejecting the 'ultimate employment decision' standard" (*id.* at p. 801), finding (among other reasons) that that standard contravened the purpose of Title VII to make persons whole for injuries suffered from employment discrimination. (*White,* at p. 802; see *id.* at p. 803 [holding the plaintiff's election to challenge her suspension without pay "through an internal grievance process does not render the decision [to suspend her] not actionable under Title VII"].)

51

liability issue has been determined by the jury.  An abuse of discretion must be shown before a reviewing court will reverse the trial judge's decision.' "]; *Leipert v. Honold* (1952) 39 Cal.2d 462, 467 ["It is presumed that in passing upon the motion [the trial judge] has weighed the evidence and the possibility of prejudice to the defendant.].)  But, " 'When a limited retrial might be prejudicial to either party, the failure to grant a new trial on all of the issues is an abuse of discretion.' " (*Liodas,* at p. 286.)

According to defendant, ordering a new trial only on plaintiff's noneconomic damages was an abuse of discretion "because [plaintiff's] erroneous constructive discharge theory was completely intertwined with [plaintiff's] claims for age and disability discrimination, and the damages resulting from those claims."  Defendant summarizes by saying that plaintiff's "constructive discharge theory was the sum and substance of his liability case," and "the jury's liability finding on [plaintiff's] discrimination claims is inseparable from the jury's conclusion that [plaintiff] was constructively discharged."

We are unable to find any factual or legal merit in defendant's argument.

First, as the special verdict form makes clear, the jury could not have found a constructive discharge without first finding that plaintiff's age (or disability) was a substantial motivating reason for any adverse employment action.  So, in that sense, plaintiff's liability claims were related.  But they were not, in any sense of the word, "inseparable."  The fact that the evidence was insufficient to sustain the constructive discharge claim (which requires intolerable working conditions) does not mean there was insufficient evidence that age (or disability) was a substantial motivating reason for plaintiff's demotion.

Second, the *only* evidence defendant cites in connection with its contention that "it would be unjust to permit the jury's finding of liability for discrimination to stand" is evidence of the emotional consequences to plaintiff of the loss of his position at The Times. But this is evidence related to damages, on which there will be a new trial, not evidence on liability issues. And defendant does not claim there was any evidence admitted on the constructive discharge issue that would have been inadmissible on the discrimination issues. Defendant merely cites plaintiff's opening statement and closing arguments to the jury to the effect that defendant's conduct amounted to a constructive discharge. But arguments are not evidence, and we see no basis to conclude that counsel's arguments somehow "tainted" the jury's discrimination findings, which were clearly separate from and a precondition for its constructive discharge finding.

Third, and most importantly, defendant misconstrues the meaning of the authorities it cites for the proposition that "where the damages issues in a case are 'so interwoven' with those of liability, a new trial on damages alone is impermissible."

Defendant cites, for example, *Hamasaki v. Flotho* (1952) 39 Cal.2d 602, for the proposition that "situations may arise where the issues are so interwoven that a partial retrial would be unfair to the other party." (*Id.* at p. 608.) Of course that is so. But in *Hamasaki*, "the jury [had], by compromising the issues of liability and damages, inextricably interwoven those issues, [so] a retrial of the damages issue alone based on the erroneous assumption that defendant's liability has been determined would be extremely unjust to him." (*Ibid.*) This, of course, is not such a case.

Nor is this a case like *Liodas, supra,* 19 Cal.3d at page 286, or like any of the other cases defendant cites of "interwoven" liability and damages. In *Liodas*, a new trial on all issues was required because a partial new trial on damages would have been prejudicial. Because of erroneous damages instructions, "it [was] not possible to determine on what basis liability was predicated," and the matter of liability for numerous allegedly fraudulent transactions was "substantially inseparable from that of damages in the present posture of the case." (*Ibid.*) The second jury "would have no basis for determining which of the transactions the first jury actually found fraudulent, and which, if any, it found fair," issues that "go to the heart of the liability question." (*Ibid.*)

Similarly, in *Gasoline Products Co., Inc. v. Champlin Refining Co.* (1931) 283 U.S. 494, 500, "the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial." This was because, "upon the new trial, the jury cannot fix the amount of damages unless also advised of the terms of the contract; and the dates of formation and breach may be material . . . ." (*Id.* at p. 499.) But it was "impossible from an inspection of the present record to say precisely what were the dates of formation and breach of the contract found by the jury, or its terms." (*Ibid.*)

This case is entirely different. Here, the issue of liability for discrimination was plainly determined by the jury, and that liability was independent of whether defendant's discriminatory conduct amounted to a constructive discharge. Defendant has not shown how it could be prejudiced by a new trial, limited to

54

the amount of noneconomic damages that resulted from the discrimination. The absence of a showing of prejudice or injustice is fatal to its claim. There was no error in the trial court's denial of a new trial on plaintiff's discrimination claims.

## DISPOSITION

The orders are affirmed. The parties shall bear their own costs on appeal.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


FLIER, J.