Filed 7/27/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| BRYCE JACKSON, | B297616 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC611403) |
| JOHN H. PARK, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Frederick C. Shaller, Judge.  Affirmed.

Cholakian & Associates, Kevin K. Cholakian and Melvin F. Marcia, Hayes, Scott, Bonino, Ellingson, Guslani, Simonson & Clause, Mark G. Bonino and Emma B. Lloyd for Defendant and Appellant.

Vaziri Law Group, Siamak Vaziri and Caryn Sanders for Plaintiff and Respondent.

_____

# INTRODUCTION

John H. Park appeals from an order granting Bryce Jackson's motion for a new trial based on attorney misconduct during closing argument in this vehicle collision case. Among other misconduct, the trial court found defense counsel falsely argued excluded evidence did not exist and argued facts outside the record.

It is improper for counsel to assert or imply facts not in evidence that counsel knows could be refuted by evidence the court has excluded. It is also improper to argue facts not in the record, and to continue to argue those facts after the court has instructed counsel to stop.

The trial court concluded defense counsel's improper arguments resulted in a miscarriage of justice warranting a new trial. Because the trial court did not abuse its discretion in granting Jackson's motion for a new trial, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

A. *The Vehicle Collision*

On March 9, 2014, at approximately 3:30 a.m., Park's vehicle struck the rear left-side of a loaded trailer towed behind Jackson's pickup truck on a local freeway. California Highway Patrol Officer Adam Powell arrived at the accident site approximately 15 minutes after the collision. Powell observed minor damage to both vehicles. Neither Jackson nor Park reported any injuries, and Powell did not call an ambulance. Jackson did not feel any pain, did not request any medical treatment, and drove himself home in his truck without the trailer.

2

B.      *Park's Arrest and Conviction for Driving Under the Influence of Alcohol*

Powell testified Park smelled of alcohol, his speech was slow and slurred at times, and his eyes were bloodshot. Park told Powell he had consumed one beer at a restaurant six to eight hours before the collision.[1] Based on Park's performance on several field sobriety tests, Powell concluded Park had been driving under the influence of alcohol and arrested him.

Park submitted to two breathalyzer tests at the police station. The results of the tests showed Park had a blood alcohol concentration (BAC) level in excess of 0.15 percent. Park ultimately pleaded no contest to misdemeanor driving under the influence of alcohol.[2]

C.      *The Trial in the Civil Case*

In February 2016 Jackson filed a personal injury complaint against Park seeking compensatory damages for negligence.[3] Jackson filed a first amended complaint in August 2018 adding a prayer for punitive damages based on Park's intoxication. Park admitted liability for the collision, but contested causation and damages.

---

[1]      Park testified at trial that he "may have" had two beers before the collision, but he "felt fine" to drive.

[2]      The record does not contain a copy of the criminal complaint or Park's plea form, but Park admitted in the civil case that he had pleaded no contest to misdemeanor driving under the influence arising out of the collision.

[3]      Jackson also sued two alleged owners and insureds of the car Park was driving when he hit Jackson. Both were dismissed at trial.

3

1.  *The alcohol evidence*

    a.    *The trial court excludes evidence of Park's arrest, conviction, and breathalyzer test results*

Park moved in limine to exclude evidence of his arrest and conviction. Jackson argued in opposition that Park's conviction and, more generally, evidence of Park's "practice of drunk driving" were relevant to Jackson's punitive damages claim and demonstrated Park's alleged lack of honesty and credibility. The court and counsel had numerous discussions about Park's motion and the alcohol-related evidence to be admitted at trial.

The court excluded evidence of Park's arrest and conviction. The court ruled Powell could testify about the results of Park's breathalyzer tests if Powell could provide sufficient foundational testimony regarding the use and operation of the machine used to administer the tests. The court stated that Jackson "should be entitled to make the case for intoxication based on the evidence that exists outside of the blood alcohol test," but that Powell could not estimate Park's BAC level or disclose the breathalyzer test results without proper foundational testimony.

    b.    *Powell's testimony and violation of the court's in limine order*

Immediately before Powell testified, the court reminded counsel of the court's ruling regarding the alcohol evidence: "Do we need to talk to [Powell] in advance before we have him testify or are we all on the same page that unless he has [the] foundational requirements for the calibration of the [breathalyzer] machine, . . . [the court] will not permit him to testify regarding the blood level results." Jackson's counsel responded that he had "told [Powell] that we're not going to

4

mention [the] BAC level." The court reiterated its ruling excluding "[t]he results of the breathalyzer test at this time, unless some foundation is laid at some point, and any implications that [Park] was arrested or that [Park] suffered a conviction later on for DUI. That's my order." Jackson's counsel stated, "I'll instruct [Powell] . . . not to mention the arrest."

During his testimony, Powell described the collision, the condition of the vehicles, and Jackson's and Park's statements about how the collision occurred. Powell also testified about his observations of Park's condition and Park's poor performance on the field sobriety tests.

Powell explained that one of the field sobriety tests, the horizontal gaze nystagmus test, is an "eye test" during which Powell looks for "six clues" in a suspect's eyes, such as pupil size and equal tracking of both eyes. Powell testified that he observed all six clues in Park's eyes, and further testified that if a person's eyes display four of the six clues, "that's going to tell me that there's a high probability that the person is over a [0].10 [percent BAC level]." Defense counsel objected that Powell's testimony violated the court's in limine order. The court overruled the objection, stating "probability is different than what we were talking about."

After Powell described Park's performance on several other field sobriety tests, Jackson's counsel asked Powell, "So after the conclusion of those tests, what did you conclude?" Powell replied, "I determined that Mr. Park was driving under the influence of an alcoholic beverage." In response to counsel's next question about whether Powell "would consider the results" of Park's field sobriety tests "to have been very conclusive with a high degree of confidence," Powell responded, "I was very confident in the

5

arrest, yes." Defense counsel objected to Powell's mention of Park's arrest, and the trial court struck the testimony.

After Powell completed his testimony, defense counsel moved for a mistrial based on Powell's violation of the court's order precluding Powell from estimating Park's BAC level and mentioning Park's arrest. Calling it a "close call," the court denied the motion. The court instead instructed the jury, "During Officer Powell's testimony, he made a certain number of misstatements. I want to clarify this and give you instructions regarding it. Officer Powell mentioned the word 'arrest' in his testimony. There is no evidence of an arrest and there will be none. Secondly, Officer Powell mentioned [a] certain blood level of alcohol in his testimony. In this case, there is no evidence of Mr. Park's blood level and there will be none. Okay. I want you to know that those pieces of evidence, I'm instructing you, those statements are not to be considered by you and it should be considered as if it did not happen."

### c. *The other alcohol evidence*

Dr. Vina Spiehler, a forensic pharmacologist, opined that based on Park's poor performance on the field sobriety tests, Park was intoxicated when he hit Jackson. Spiehler also testified that one beer would not cause a person to fail a field sobriety test, and that to have failed the field sobriety tests Park would likely have consumed at least five or six beers before the collision.

### 2. *The medical and other evidence*

### a. *Jackson's back pain and treatment*

Jackson testified that the day of the collision he felt stiff and sore. Later that day or the next day Jackson retained a

6

lawyer to obtain advice about medical treatment and the damage to his truck and trailer.

In March 2014 Jackson saw Dr. Stephanie Lafayette for a cold and for preexisting hypertension.[4]  Before meeting with Dr. Lafayette, Jackson completed an intake form on March 18, 2014 on which he responded "no" to the questions, "Do you have a history of medical problems?" and "Do you have any medical problems now?"  On March 24, 2014 Jackson reported having zero pain in response to a pain scale question.  Park subpoenaed Dr. Lafayette to testify at trial; she testified that during Jackson's March 25, 2014 appointment, Jackson did not mention any back pain.

Jackson testified he did not mention his back pain to Dr. Lafayette because his attorneys had made an appointment for him to see an orthopedic surgeon, Dr. Stepan Kasimian, the following week.  Jackson later rescheduled his appointment with Dr. Kasimian to May 2014.

Jackson first saw a chiropractor about his back pain in April 2014, a month after the collision.  Jackson testified the chiropractor's treatment made him "feel worse and hurt, so [he] needed to stop."  The chiropractor did not testify at trial.

Jackson saw Dr. Kasimian on May 2, 2014 for back pain radiating to his lower leg and numbness in his fingers.  Jackson testified he had never before experienced similar lower back pain, and that no doctor had ever told him before the collision that he had any lower back condition.  Dr. Kasimian ordered an MRI of Jackson's back in July 2014, which revealed a disc herniation or

---

[4]     Jackson saw Dr. Lafayette in jail while incarcerated for an unrelated matter.  The trial court excluded evidence of Jackson's criminal history and incarceration.

protrusion in Jackson's lower back. Jackson testified Dr. Kasimian discussed treatment options with him, including physical therapy, injections, and surgery, but Jackson felt uneasy about surgery and sought other opinions. Dr. Kasimian did not testify at trial.

In August 2014 Jackson saw Dr. Aaron Coppelson, who performed an electromyography (EMG) test. The EMG test was normal and showed "no issues in [Jackson's] cervical spine." Dr. Coppelson did not testify at trial.

In November 2014 Jackson saw another orthopedic surgeon, Dr. Kasra Rowshan, for pain radiating from his back to his legs, and numbness and tingling in his fingers. Dr. Rowshan reviewed photographs of the March 9, 2014 collision, Jackson's medical records, and the results of the July 2014 MRI exam. Dr. Rowshan opined that the collision "led to the injury in [Jackson's] lumbar spine," including a herniated disc. Dr. Rowshan also testified Jackson had a congenital condition that could predispose Jackson to spinal slippage and instability.

Starting in December 2014 Dr. Rowshan administered three lumbar epidural injections to Jackson over six months. When Jackson's pain returned following the injections, Dr. Rowshan performed a lumber laminectomy surgery on Jackson in July 2015 to remove nerve pressure. Jackson's back pain initially improved following the surgery, but eventually returned to its presurgery level.

In October 2018 Jackson complained to Dr. Rowshan of lower back pain and pain radiating down his right leg. Jackson reported the pain interfered with his ability to stand and to perform daily activities. Dr. Rowshan recommended Jackson undergo a spinal fusion surgery to remove Jackson's damaged

8

lumbar disc. Jackson had not had the second surgery at the time of the trial, but testified he planned to have the surgery because of his continuing pain. Dr. Rowshan opined that as a result of the collision Jackson would have back pain for the rest of his life.

Jackson testified he worked at his mother's furniture store from 2009 to 2018. Jackson did not call any of his coworkers to testify at the trial. Jackson testified his daily life after the collision was "a lot harder," and that he was rude to his family and could not participate in activities with his children.

Jackson's wife, Justine Thompson, testified Jackson told her after the collision that his back hurt, and that the pain worsened in the months after the collision. Thompson testified that since the collision Jackson had become short-tempered with their children and could not play with them because of his back pain.

b. *The accident reconstruction evidence*

Jackson's accident reconstruction expert, John Landerville, testified Jackson's truck incurred significant frame damage in the collision. Landerville described Jackson's tow hitch as "basically destroyed" in the collision, and Park's car as "a total loss and gone." Landerville testified the force of the collision lifted the suspension of Jackson's truck, which Jackson would have felt inside the truck.

Jackson's biomechanical expert, Dr. Rami Hashish, testified about the forces in the collision, and the effect of a low impact collision on a hypothetical patient at increased risk for injury. Dr. Hashish opined the collision was sufficiently severe to cause the type of disc injury Jackson suffered.

Park's accident reconstruction and biomechanical expert, Judson Welcher, ran simulations of the crash. Welcher opined

Jackson's trailer tow hitch had not been properly installed, and thus had failed at a lower force load than it should have. Welcher noted little damage to Jackson's trailer, and disagreed with Landerville that the truck suspension had lifted in the collision. Welcher also testified that while Jackson's preexisting conditions increased Jackson's risk of injury in a traffic collision, the same conditions also increased his risk of injury from everyday lifting.

### c. The other medical expert testimony and the medical billing evidence

Jackson's medical expert, radiologist Dr. Alyssa Watanabe, reviewed Jackson's July 2014 MRI films. Dr. Watanabe testified Jackson's MRI showed an acute disc herniation or protrusion that had occurred less than six months before the scan.

Defense expert Dr. Richard Rhee, a radiologist, reviewed Jackson's medical records. Dr. Rhee acknowledged that Jackson's July 2014 MRI scan showed a small disc protrusion, but could not conclude based on the protrusion's appearance "that it was related to the subject accident on a more probable than not basis."

Another defense medical expert, orthopedic surgeon Dr. Steven Nagelberg, testified that Jackson did not need surgery as a result of the collision, and did not need surgery at all. Dr. Nagelberg questioned whether Jackson had suffered any spinal injury and opined that Jackson's spinal scan showed no structural abnormalities.

The parties offered competing expert opinions about the reasonable value of Jackson's medical treatments. Jackson's forensic medical coder and biller Jacqueline Nash Bloink opined that the reasonable value of Jackson's past medical expenses was $70,666.81, and the estimated reasonable value of Jackson's

future medical expenses was $66,159.  Park's medical billing auditor Nancy Fraser Michalski opined that the reasonable value of Jackson's past medical expenses was $36,661.36.

### 3.  *The closing arguments*

The court instructed the jury before closing arguments. The instructions included CACI No. 203 (party having power to produce better evidence), which states, "You may consider the ability of each party to provide evidence.  If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence."

In his closing argument, Jackson's counsel argued Park "was drunk [and] couldn't see [Jackson's] trailer because he was intoxicated."  Jackson's counsel asserted the evidence showed the collision caused Jackson's back injury.  Jackson sought $70,666.81 in past economic damages, $66,159 in future economic damages, and more than $1,200,000 in past and future noneconomic damages.  Jackson's counsel also argued Park acted fraudulently and with malice by lying about the number of alcoholic drinks he had consumed before the collision.

At the outset of the defense closing argument, defense counsel Kevin Cholakian argued "there was absolutely no evidence that John Park intended to hurt anybody or acted in a despicable manner."  Defense counsel asserted that the "only reason" Jackson sought punitive damages was "to cloud your judgment."

Defense counsel argued Park "just clipped" Jackson's trailer by "mistake" after Park missed his freeway exit.  Defense counsel continued:

> "There's no evidence that alcohol caused [Park] to make that mistake, but it was 3:30 in the morning.

11

He said he was tired. So he made a mistake. He admitted responsibility. But trying to take that act and trying to say alcohol was the reason why, where's the evidence that alcohol caused that? There's no evidence that alcohol caused that. Again, he clipped the trailer.

"There's zero evidence of an arrest, of BAC or [of a] conviction. The court, the judge, told you all, if you remember last week, . . . 'During Officer Powell's testimony, he made a certain number of misstatements. I want to clarify this and give you instructions regarding it. Officer Powell mentioned the word "arrest" in his testimony. There is no evidence of an arrest and there will be none.'

"'Secondly, Officer Powell mentioned [a] certain BAC level of alcohol in his testimony. In this case there's no evidence of Mr. Park's blood alcohol, and there will be none, okay. I want you to know these pieces of evidence, I'm instructing you, those statements are not to be considered by you, and it should be considered as if it did not happen. Okay.'

"So the judge has instructed that nothing beyond the suspicion by Officer Powell is involved . . . .

"There's only one point, to cloud your judgment about the real case that's here, which is, is this a personal injury case or not? Is this a rear-end accident or not? That's what the case is about. That's it. There's no definitive evidence of intoxication, only evidence of a subjective test. I'm

not criticizing the officer. That was his opinion, that's all we have, and that's all there is."

As defense counsel made this argument, he displayed a demonstrative exhibit that stated, "There is zero evidence of arrest, BAC, or [c]onviction; the only evidence in the case regarding alcohol consumption before this accident was suspicion by Ofc. Powell. . . . No definitive evidence of intoxication, only evidence of a subjective test regarding physical activities a tired John Park allegedly failed at 3:30 a.m."

Defense counsel then addressed CACI No. 203. He argued:

"This instruction is an important instruction that the court's given to you. 'You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it should have provided stronger evidence, you may distrust the weaker evidence.' Ladies and gentlemen, what's wrong with this picture? What's wrong with the picture in this case in terms of the witnesses that were presented? You didn't hear from Mr. Jackson's chiropractor, did you? You didn't hear from Dr. Kasimian, did you? You didn't hear from Dr. Koppleson [*sic*] who did a cervical EMG that was negative . . . . You didn't hear of any doctor that the plaintiff presented, that the plaintiff even saw after this accident for the first seven months following this accident. That's just kind of unheard of.

"[I]f you were injured in an accident, aren't you going to have some medical attention and bring, as the plaintiff in a case this long, two weeks long, bring a doctor who actually saw the plaintiff or even a

13

chiropractor in the first seven months after an accident?  It's unthinkable you don't bring that.

"And the plaintiff has that responsibility.  They had the burden of proof. . . .  Did they subpoena these folks?  Did they bring them in like we brought in Dr. Lafayette, who came all the way from Palm Desert, a lot farther from where these folks traveled from in Los Angeles.  What's up with that?

"What's up with this?  [Jackson] worked, he said, for nine years at the [furniture store], nine years.  Nowhere else."

Jackson's counsel objected in the jury's presence, "This is not in evidence."  Defense counsel replied, "It sure is.  He testified to it." The court responded, "The jury will have to decide whether it's in evidence or not.  So go ahead."

Defense counsel continued with his argument:  "[Jackson] did not work, other than [at] the [furniture store], in the last nine years.  He said that in his deposition. . . .  He has employees that are co-fellow employees or other employees that he's worked with. It's unheard [of] that you don't have the co-employees come, at least one or two of them, and say 'Hey, yeah, I saw him walking around.  I saw him hurt.  I saw him complain.  He told me about how he got injured.'  Where was a single witness from the [furniture store]?  Not a one."

At this point the court intervened, and the court and defense counsel had the following exchange in the jury's presence:

"[COURT:]  Okay.  I don't know if I misconstrued counsel's objection, but to the extent that you're commenting on [a] failure to call witnesses that were

14

equally available to both sides, that's improper.  Let's not mention it.

[DEFENSE COUNSEL:]  Well, I don't know that they were equally available to both sides, Your Honor, but the bottom line is that's where [Jackson] worked.  And he had the ability—they had the ability to call those witnesses.  Burden of proof—

[COURT:]  I have no evidence to suggest [Jackson] did or didn't, or you did or didn't.  That's the problem.

[DEFENSE COUNSEL:]  Okay."

Despite the court's comments, defense counsel picked up where he had left off:  "In any event, there was no witness called from the [furniture store].  The burden of proof is on the plaintiff to prove their case."

After summarizing and contrasting the testimony of the parties' witnesses, defense counsel next turned to Dr. Lafayette:  "Dr. Lafayette, we didn't hire her, ladies and gentlemen.  We did not hire [her].  You saw her.  Do you think she was biased?  Do you think she was committed to one side or the other?  We didn't know her.  We didn't know about her.  You know why we didn't know about her early on . . . ?  We didn't know because plaintiff in answers to interrogatories in discovery and in his deposition . . . ."

Jackson's counsel objected, and the following colloquy occurred in the jury's presence:

"[JACKSON'S COUNSEL:]  Not in evidence.

[COURT:]  That was not in evidence.

[DEFENSE COUNSEL:]  Yeah, not in our case, but in his deposition.

15

[JACKSON'S COUNSEL:] Not in evidence, Your Honor.

[DEFENSE COUNSEL:] No, the deposition, he didn't. That's in evidence.

[COURT:] That part of the deposition was not read. So sustained. The jury is to disregard that argument.

[DEFENSE COUNSEL:] Wait a minute, Your Honor. There was—we asked who all the doctors were he saw, and he didn't mention Dr. Lafayette. So—

[COURT:] Interrogatory.

[DEFENSE COUNSEL:] No, I agree with you on the interrogatory, but the deposition, if we ask 'who have you seen,' and he's never mentioned Dr. Lafayette.

[COURT:] Well—

[DEFENSE COUNSEL:] That's the point.

[COURT:] I don't recall that testimony, that answer being read in.

[DEFENSE COUNSEL:] What answer is that?

[COURT:] The answer you are referring to from his deposition.

[DEFENSE COUNSEL:] We—

[COURT:] So, in other words, it's outside of the evidence. Don't argue it.

[DEFENSE COUNSEL:] Okay."

Undeterred by the court's instructions, defense counsel continued his argument about Dr. Lafayette: "Dr. Lafayette we found out about. We learned about Dr. Lafayette. That is why Dr. Lafayette came to this trial, because we tracked her down. She retired, and we found her, and we subpoenaed her for

16

deposition. . . . [A]nd then after that deposition, we subpoenaed her for trial. It was my office that did that."

Jackson's counsel again objected, and the following exchange occurred, again in the jury's presence:

"[JACKSON'S COUNSEL:] Your Honor, this is all improper argument.

[COURT:] What you did in an investigation is not in evidence. So sustained. So, counsel, stick to what was in evidence through the witnesses in this case; otherwise, I think you are getting close to misconduct here.

[DEFENSE COUNSEL:] Okay. We called Dr. Lafayette. We did call her, that is standard, for trial.

[JACKSON'S COUNSEL:] Okay. Can we have a sidebar please?

[DEFENSE COUNSEL:] That we subpoenaed her for trial?

[JACKSON'S COUNSEL:] Sidebar, please.

[COURT:] Well, okay. Why don't we take a ten-minute break."

With the jury on a break, the court and counsel discussed Jackson's counsel's objections and defense counsel's arguments. Jackson's counsel asserted that defense counsel's arguments about the alcohol evidence and Dr. Lafayette constituted "blatant misconduct."

The court informed defense counsel that arguing matters not in evidence "is improper." The court stated that no evidence admitted at trial supported defense counsel's claims that Jackson had not identified Dr. Lafayette in his discovery responses, or

17

that defense counsel had located Dr. Lafayette through counsel's investigation. The court also stated that defense counsel's "suggest[ion] that the plaintiff didn't call witnesses without any information about whether they're available or not," when "you could have called any one of those three witnesses," was improper. The court concluded: "You have really stepped over the line here."

The court then identified other improper portions of defense counsel's closing argument and demonstrative exhibits:

> "[T]here were several things in your slideshow here that are totally improper. . . . [W]hen you have made a motion to exclude the blood alcohol level and the fact of an arrest, and then you use that as a centerpiece of your argument, you know, you flip it around. . . .
>
> "So all of these things are going to line up pretty heavily to give me the impression that there's misconduct here. . . . You presented some pretty strong evidence. Stick with it."

When the trial resumed, the court admonished the jury to disregard defense counsel's arguments about witnesses Jackson had not called and about the alcohol evidence: "So counsel commented on the failure of plaintiff to call certain witnesses. These witnesses were equally available to both sides who have been called in this trial. You must disregard such argument in reaching your decision this matter. Secondly, counsel mentioned that there was no evidence of a blood alcohol level or arrest. There was no such evidence or such blood alcohol level or arrest one way or the other on this subject. You must disregard such argument in reaching your decision in this matter."

18

Following the court's admonition, defense counsel continued his closing argument. Defense counsel argued that "if there's damages," the jury should award Jackson "like $15,000 for his discomfort."

D.   *The Jury Verdict*

The jury returned its verdict the following day. The jury found Park's negligence was a substantial factor in causing Jackson's harm. The jury awarded Jackson $15,235 in past economic damages and $2,000 in past noneconomic damages. The jury did not award Jackson any future economic or noneconomic damages. The jury also found Park's conduct was not malicious, oppressive, or fraudulent. The court entered judgment on March 6, 2019.

E.   *The Motion for a New Trial*

On March 21, 2019 Jackson filed a notice of his intention to move for a new trial. Jackson identified several grounds for his motion, including irregularity in the proceedings pursuant to Code of Civil Procedure section 657, subdivision (1). Jackson argued defense counsel had engaged in prejudicial misconduct during closing argument by exploiting the court's in limine order excluding evidence of Park's arrest, conviction, and breathalyzer test results to suggest falsely that Park was not intoxicated during the collision and was not arrested after the collision.

Park argued in opposition that defense counsel had not engaged in misconduct, but that if he had committed misconduct, the court's admonitions had remedied any improper argument. Park also argued the evidence supported the jury's verdict.

At the April 22, 2019 hearing on the motion, the court stated that defense counsel had taken the "in limine order

19

precluding the admission of the [BAC] analysis, the fact of arrest [and] the conviction . . . for DUI, and then the court's admonition after Officer Powell's testimony, stating that we should treat this as [if] it did not exist, but then you flipped it around and basically used it as a sword to say . . . there was no DUI, there was no abnormal BAC, or there was no conviction. At least you implied that by your argument."

The court also stated that it was improper for defense counsel to have commented that Jackson had not called witnesses to testify when the witnesses were known and equally available to the defense by subpoena, and improper to have claimed Jackson had hidden Dr. Lafayette from the defense. Describing the trial as a "close-call case" because the defense presented "pretty strong" evidence the collision was minor, but Jackson "had very strong evidence" the collision caused a disc herniation resulting in spinal surgery, the court took the motion under submission "to consider the whole issue of prejudice."

F.    *The Trial Court's Order Granting the Motion for a New Trial*

The court issued a detailed order the following day vacating the March 6, 2019 judgment and granting Jackson's motion for a new trial on causation and damages.[5] The court ruled, "The order is based upon multiple incidents of misconduct by defense counsel . . . during final argument that constitutes a prejudicial irregularity in the proceeding under [Code of Civil Procedure section] 657(1) that could not be cured by the admonitions of the court to the jury to disregard the inappropriate argument and

---

[5]    The court ruled liability would not be retried because Park had admitted liability.

20

which deprived plaintiff of a fair trial." The misconduct "was prejudicial and likely caused the jury to give an inadequate award of compensatory damages and to fail to reach the issue of punitive damages."

First, the trial court ruled that, relying on the court's admonition to the jury regarding Powell's testimony, defense counsel falsely argued no evidence existed that Park had been arrested for or convicted of driving under the influence, or that Park had a BAC level in excess of the legal limit. The court explained that when "a party has been precluded from offering evidence because of an evidentiary ruling finding it inadmissible, the party asserting the evidentiary sanction should not be permitted to use the court's ruling as a basis to make an argument that implies that the evidence is much more favorable to the asserting party than it actually is."

Second, the court found defense counsel improperly argued Jackson had concealed Dr. Lafayette from the defense, and that defense counsel "had to track Dr. Lafayette down" so she could testify at trial. The court further observed that defense counsel argued with the court in front of the jury after the court instructed counsel not to claim Jackson had not identified Dr. Lafayette in his discovery responses. The court found defense counsel's persistent argument "was clearly an intentional effort to complete the argument to clearly advise the jury of the untrue assertion that plaintiff had concealed evidence in discovery," and was "misconduct because it repeatedly [brought] before the jury a theory of willful suppression of evidence based upon facts that were not in evidence." Defense counsel's continued argument before the jury "after the court sustained plaintiff's objection and

21

admonished the jury not to consider the argument" was "further misconduct."

Third, the court ruled defense counsel improperly argued the jury should infer from Jackson's failure to call medical witnesses and coworkers known and equally available to the defense that the witnesses would have offered testimony adverse to Jackson. The court found that "the resulting low verdict on damages likely resulted in part from the jury's discounting of plaintiff's witnesses on damages based upon this argument." Further, defense counsel improperly argued based on CACI No. 203 that Jackson's witnesses' trial testimony was weaker evidence than the evidence the uncalled witnesses would have offered.[6]

The court found defense counsel's misconduct prejudiced Jackson. Jackson produced "very compelling and credible medical evidence" supporting his contention he suffered a herniated disc in the collision that required surgery. The court concluded, "The award of $15,235 for past medical special damages and $0 for future medical specials and for only $2,000 in pain and suffering was achieved by defendant by unfair tactics. The weight of the evidence indicated to the court that the jury's verdict should have been much greater." The court also ruled that its admonitions to the jury were insufficient to negate the prejudicial effect of defense counsel's misconduct, "result[ing] in a miscarriage of justice."

---

[6] The court also found defense counsel disparaged Jackson's counsel's character, and "falsely and improperly implied that [Jackson's] argument[s] [were] specious because [Jackson's counsel] was attempting to obtain a verdict based upon an emotional appeal to [each] juror's self-interest."

Park timely appealed the order granting the motion for a new trial.[7]

## DISCUSSION

A.    *Applicable Law and Standard of Review*

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute.  [Citation.] [Code of Civil Procedure] [s]ection 657 sets out seven grounds for such a motion: (1) 'Irregularity in the proceedings'; (2) 'Misconduct of the jury'; (3) 'Accident or surprise'; (4) 'Newly discovered evidence'; (5) 'Excessive or inadequate damages'; (6) 'Insufficiency of the evidence'; and (7) 'Error in law.'" (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633 (*Oakland Raiders*); accord, *Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1089.)  "Attorney misconduct is an irregularity in the proceedings and a ground for a new trial." (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148 (*Garcia*).)

---

[7]    Park filed three motions to augment the appellate record. We granted Park's first and second motions.  Park's third motion, which Jackson opposes, seeks to augment the appellate record with copies of discovery responses and a deposition transcript Park acknowledges were not introduced into evidence at trial. "Augmentation does not function to supplement the record with materials not before the trial court."  (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3; see also Cal. Rules of Court, rule 8.155(a)(1)(A) [a reviewing court may order the record augmented to include "[a]ny document filed or lodged in the case in superior court"].)  Park's third motion to augment is denied.

We review the order granting a new trial for an abuse of discretion. (*Oakland Raiders*, *supra*, 41 Cal.4th at p. 636.) "'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside.'" (*Simers v. Los Angeles Times Communications* (2018) 18 Cal.App.5th 1248, 1275 (*Simers*).)[8]

## B. *The Trial Court Did Not Abuse Its Discretion in Granting the Motion for a New Trial*

### 1. *The misconduct*

#### a. *The misconduct regarding the alcohol evidence*

Defense counsel's arguments that "[t]here's no evidence that alcohol caused" the collision, that "[t]here's zero evidence of an arrest, of BAC or [of a] conviction," and that Powell's "opinion" of Park's intoxication was "all there is" were improper. Evidence of Park's arrest, conviction, and BAC level existed; the trial court had excluded the evidence at Park's behest. It is improper for

---

[8] Park argues we should reverse the trial court's order granting a new trial because substantial evidence supports the jury's verdict. The standard for review of an order granting a new trial motion is not whether substantial evidence supports the verdict, but whether the court manifestly and unmistakably abused its discretion in granting the new trial motion. (*Simers*, *supra*, 18 Cal.App.5th at p. 1275.)

24

counsel to assert or imply facts not in evidence that counsel knows excluded evidence could refute. (*Hoffman v. Brandt* (1966) 65 Cal.2d 549, 555 [defense counsel's argument falsely implying defendant lacked insurance was misconduct requiring reversal of judgment]; *Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1487 ["if Frio were to be precluded from giving testimony because of the evidentiary sanction of [Penal Code] section 632 [precluding admission of evidence obtained through 'eavesdropping upon or recording a confidential communication'], the party asserting the sanction should not be permitted to use it as a shield for perjury"]; *Cordi v. Garcia* (1940) 39 Cal.App.2d 189, 197 ["It was prejudicial error for plaintiff's attorney to refer in his argument to the jury to the contents of reports or letters affecting the injuries received by the plaintiff, the inspection and use of which documents were refused and which instruments were not received in evidence. The jury may have secured the impression from the argument that they were much more favorable to the plaintiff than the facts would warrant."]; see also *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 325-326 (dis. opn. of Traynor, J.) ["It is misconduct to suggest facts not in evidence that counsel knows could be contradicted by evidence the court has excluded."]; *Hansen v. Warco Steel Corp.* (1965) 237 Cal.App.2d 870, 878 ["Counsel was guilty of serious misconduct in arguing the importance of the excluded document and in asking the jury to draw an inference because plaintiff's attorney had made an objection which the court had sustained. This kind of misconduct, under some circumstances, is ground for reversal of a judgment."].)

Furthermore, defense counsel not only falsely argued "[t]here's no evidence that alcohol caused" the collision, he also

used the court's admonition about Powell's testimony to fortify his assertion that "[t]here's no definitive evidence of intoxication." After repeating the court's admonition, defense counsel told the jury "the judge has instructed that nothing beyond the suspicion by Officer Powell is involved." This argument both grossly misrepresented the court's admonition and improperly infused defense counsel's misleading argument with the authority of the court. The trial court did not err in finding defense counsel's arguments about the alcohol evidence constituted misconduct.

b. *The misconduct regarding Dr. Lafayette*

Defense counsel's arguments that Jackson did not disclose Dr. Lafayette in his discovery responses and that defense counsel located Dr. Lafayette through counsel's own investigation were also improper. Defense counsel told the jury that Jackson did not disclose Dr. Lafayette "in answers to interrogatories in discovery and in his deposition." After Jackson's counsel objected, defense counsel agreed the interrogatory responses to which he had referred were not in evidence, but argued with the court that the deposition testimony had been read into evidence. The court disagreed, ruling "it's outside of the evidence. Don't argue it."

Ignoring the court's ruling, defense counsel then argued to the jury that the defense "found out about" Dr. Lafayette, and that Dr. Lafayette "came to this trial because we tracked her down. . . . It was my office that did that." After the court sustained another objection by Jackson's counsel, defense counsel again argued with the court asserting, "We called Dr. Lafayette. We did call her, that is standard, for trial."

Park appears to concede defense counsel's arguments about Dr. Lafayette were improper. Park instead claims the trial court's admonition to the jury following the mid-argument break

26

cured any prejudice to Jackson from the improper arguments. The admonition, however, did not address defense counsel's improper arguments about Dr. Lafayette. The admonition addressed defense counsel's arguments about the alcohol evidence and Jackson's failure to call witnesses. Because the admonition did not refer to Dr. Lafayette, it could not have cured the prejudice to Jackson from defense counsel's arguments about her.[9]

Moreover, Park ignores that defense counsel repeatedly argued with the court in the jury's presence about Jackson's alleged failure to disclose Dr. Lafayette in his discovery responses. The court sustained Jackson's objection to defense counsel's first reference to the discovery responses and instructed the jury to "disregard that argument." After the court ruled, defense counsel continued to argue with the court, including repeatedly referring to the deposition testimony the court had just ruled was not in evidence. The court again ruled the

---

[9] Park's insistence that Jackson did not disclose Dr. Lafayette's identity in his discovery responses misses the point. As Park concedes, neither the interrogatory responses nor the deposition testimony to which defense counsel referred in closing argument was in evidence. Defense counsel's arguments about Jackson's discovery responses were not improper because they were factually wrong; they might have been factually correct, i.e., Jackson may not have identified Dr. Lafayette in his discovery responses. The arguments were improper because the interrogatory responses and deposition testimony to which defense counsel referred were not in evidence. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795-796 ["'[w]hile a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences'"].)

27

deposition testimony was not in evidence, instructing defense counsel not to argue that Jackson had not disclosed Dr. Lafayette. Defense counsel disregarded the court's ruling, telling the jury that Dr. Lafayette "came to this trial because we tracked her down." Jackson's counsel objected again, and the court sustained the objection, again instructing defense counsel not to argue matters not in evidence: "What you did in an investigation is not in evidence. So sustained. . . . [S]tick to what was in evidence through the witnesses in this case." Defense counsel argued with the court yet again before the court finally excused the jury for a break.

Defense counsel's conduct during this whole sorry episode was improper. It was improper to argue evidence not in the record, improper to refer repeatedly to that evidence after the court ordered counsel to stop, and improper to argue with the court in front of the jury in a transparent effort to highlight the evidence the court had instructed counsel not to mention. The trial court did not err in finding defense counsel's arguments about Dr. Lafayette constituted misconduct.

2. *The prejudice*

"[I]t is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial." (*Garcia, supra*, 204 Cal.App.4th at p. 149; accord, *Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 568 ["[A]ttorney misconduct is more common than reversal for attorney misconduct. Prejudice must be shown."].) In determining whether misconduct was prejudicial, "a reviewing court makes 'an independent determination as to whether the error was prejudicial.'" (*Garcia*, at p. 149.) The court "must determine whether it is reasonably

28

probable [that the [party asserting misconduct occurred]] would have achieved a more favorable result in the absence of that portion of [attorney conduct] now challenged." (*Ibid.*)

The common theme of defense counsel's improper arguments was that Jackson was untruthful—that he lied about Park's intoxication and concocted a punitive damages claim, and that he served false discovery responses and concealed Dr. Lafayette from the defense. Defense counsel falsely argued no evidence of Park's arrest, conviction, or BAC level existed, and misrepresented the court's curative admonition as a jury instruction that the only evidence of intoxication was Powell's "suspicion." Defense counsel then argued Jackson hid Dr. Lafayette by failing to disclose her identity in discovery, requiring the defense to "track[] her down" through defense counsel's investigation. Either of these improper arguments might have been sufficiently prejudicial to Jackson to warrant a new trial. Cumulatively, we readily conclude it is reasonably probable Jackson would have achieved a more favorable result without defense counsel's improper arguments.

The jury's verdict in Jackson's favor demonstrated that the jury found the collision caused by Park's negligence harmed Jackson. But the jury awarded significantly less in past damages than Jackson sought, less in past economic damages than Park's expert calculated, and no future damages. The jury appears to have almost entirely discounted Jackson's evidence, including the testimony of his treating surgeon, that as a result of the collision Jackson suffered a herniated disc that required surgery, and that Jackson may well require a second surgery. It is reasonably probable defense counsel's arguments that Jackson concealed Dr. Lafayette from the defense, and, moreover, did so by means of

29

litigation subterfuge, caused the jury to magnify Dr. Lafayette's testimony, to disregard Jackson's explanation for his failure to mention his back pain to her, and to discount unfairly the testimony of Jackson's witnesses about the extent of Jackson's damages while overemphasizing Park's witnesses' testimony.

The jury also rejected Jackson's argument that Park's intoxication and statements about his drinking on the night of the collision demonstrated malice, fraud, and oppression. It is reasonably probable defense counsel's improper arguments about the alcohol evidence—most egregiously, his false claim that "the judge has instructed that nothing beyond the suspicion of Officer Powell is involved"—unfairly influenced the jury's evaluation of Jackson's evidence and arguments about Park's intoxication. The trial court did not abuse its discretion in concluding that defense counsel's misconduct prejudiced Jackson and warranted a new trial on causation and damages.[10]

---

[10] Because we conclude the trial court did not abuse its discretion in granting Jackson's new trial motion based on defense counsel's improper arguments about the alcohol evidence and Dr. Lafayette, we need not reach Park's contentions that the trial court erred in finding defense counsel's arguments about Jackson's failure to call witnesses and disparagement of Jackson's counsel were also improper and provided additional grounds to grant Jackson's motion.

## DISPOSITION

The order granting a new trial on causation and damages is affirmed.  Jackson shall recover his costs on appeal.


McCORMICK, J.*


We concur:


SEGAL, Acting P. J.


FEUER, J.

---

* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.